DATE: 2/18

BY: ____

FILED
IN CLERKS OFFICE

2005 FEB 16  P 1:04

U.S. DISTRICT COURT
DISTRICT OF MASS.

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

**UNITED STATES OF AMERICA,**
*ex rel.* **GORDON F.B. ONDIS**

05    10312 MLW

           Plaintiff,

           vs.

**CITY OF WOONSOCKET, RHODE
ISLAND; SUSAN D. MENARD, in
her individual capacity and in her
capacity as Mayor of the City of
Woonsocket, Rhode Island; JOEL D.
MATHEWS, in his individual
capacity and in his capacity as Director
of Planning and Community Devel-
opment of the City of Woonsocket, Rhode
Island; PAULETTE MILLER, in her
individual capacity and in her capacity
as Assistant Director of Planning and
Community Development of the City of
Woonsocket, Rhode Island; OWEN T.
BEBEAU, in his individual capacity
and in his capacity as Director of
Human Services of the City of
Woonsocket, Rhode Island; and
MICHAEL ANNARUMMO, in his
individual capacity and in his capacity
as Director of Administration and Director
of Public Works of the City of Woonsocket,
Rhode Island;**

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No.

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(B)(2)**

**DO NOT PLACE IN
PRESS BOX**

**DO NOT ENTER
ON PACER**

RECEIPT # ____
AMOUNT $ 250
SUMMONS ISSUED N/A
LOCAL RULE 4.1 ____
WAIVER FORM ____
MCF ISSUED ____
BY DPTY. CLK. ____
DATE 2/16/05

**COMPLAINT
AND
DEMAND FOR JURY TRIAL**

1



### *Introduction*

1.        Plaintiff, the United States of America, by Gordon F.B. Ondis as the Relator, brings this action under the False Claims Act, as amended, 31 U.S.C. § 3729, et seq., and under the common law of the Commonwealth of Massachusetts and under the common law of the State of Rhode Island and Providence Plantations.

2.        Relator, on behalf of the United States, seeks to recover damages, penalties, fees and expenses arising from certain affirmative false representations, assurances, statements and certifications made to the U.S. Department of Housing and Urban Development  (hereinafter "HUD") by Defendants and arising from material omissions of fact within such false representations, assurances, statements and certifications.  Such statements were made in order to obtain federal assistance under the Community Development Block Grant Program (hereinafter "CDBG") and/or other related federal programs.  But for such false representations, assurances, statements and certifications, such financial assistance would not have been provided to Defendant City.  Conversely, HUD would have been precluded by operation of law from providing financial assistance to Defendants had it been aware of the true public policies of Defendants in total contravention of the purposes of the CDBG and other related programs.   Relator also seeks recovery based upon common law theory of unjust enrichment as well as statutory and common law conspiracy whereby all defendants are made responsible through direct and vicarious liability.

3.        Beginning in April, 2000 and continuing to the present, Defendants have assured HUD that as a condition of federal assistance, the City of Woonsocket did, and

would continue, in future, to support, encourage and assist in the maintenance, expansion and development of affordable housing within its borders in compliance with 42 U.S.C. § 5301, et seq., which specifies such housing, *inter alia,* as a national objective.    Affordable housing is most often assured through federally subsidized housing.  False representations, assurances, statements and certifications were made by Defendants through a pattern and scheme of deception for the purpose of convincing HUD that Defendants were seriously addressing the housing needs of low and moderate income citizens through support of various affordable housing programs.   In fact, Defendants, since 1995, have embraced, implemented and administered a policy of actively discouraging the development of affordable, subsidized housing within Defendant City in direct opposition to the representations, assurances, statements and certifications made to HUD to assure eligibility for CDBG and other program funds. Such false representations, assurances, statements and certifications were made for the purposes of inducing HUD to overtly conclude that the housing needs of Defendant City were being addressed and, therefore, HUD might continue to provide funds to Defendant City in support of its national objectives referred to at 42 U.S.C. § 5301, et seq. to provide money to Defendants for use on non-housing related expenditures. The deception inherent in such representations, assurances, statements and certifications was concealed from both HUD and private citizens by: i) implementation of an undisclosed policy of refusing access to the documents bearing such false representations, statements, assurances and certifications in contravention of promises to HUD to maintain public access to HUD program related records, ii) falsely representing to HUD and to the public that such records would be made available at the local public library

3

when, in fact, no such records were made available,  iii) failing to inform HUD of Defendant City's true policies,  iv) eliminating maintenance of written records of its zoning deliberations and substitution of such records with tape recordings of such deliberations making it cumbersome, if not impossible to identify speakers and to access docketed matters; and further,  v)  failing to update documents submitted to HUD in contravention of statutory requirements and promises to HUD to do so.  Consequently, HUD officials were unable to learn the true nature of the public policies adopted and implemented by Defendants.

4.        The housing programs described are for the benefit of low and moderate income, minority, disabled, handicapped and elderly citizens.

5.        In fact, simultaneous with offering to HUD the representations, statements, assurances and certifications required to obtain CDBG funds, Defendant City, through the efforts of  Defendant Susan Menard (hereinafter "Mayor"), and supported by the City Council of Defendant City, has adopted an active, affirmative policy of blocking the development and reducing the amount of such affordable, subsidized housing and of harassing and intimidating the providers of such affordable, subsidized housing for the purpose of dissuading their continued participation in affordable, subsidized housing programs.   Such policy is but one element of Defendant City's municipal public policy adopted in total contravention of the national objectives promoted by HUD funding and to which Defendants pledged support.

### *Jurisdiction and Venue*

6.          This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3730.

7.          Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants filed their false statements, assurances and certifications at HUD's Regional office in Boston, Massachusetts within the District of Massachusetts.  31 U.S.C. § 3732(a) specifically provides for venue in a district in which such false submissions were made.

### *Parties*

8.          Relator Gordon Ondis is the owner of HEDCO, a company that, in turn, owns and operates approximately three hundred (300) units of housing within the City of Woonsocket, Rhode Island.  Such housing principally serves low and moderate income populations, including minority, disabled and elderly citizens of the City by acceptance of housing subsidy vouchers issued through HUD programs administered by the local housing authority, Woonsocket Housing Authority (hereinafter "WHA").  Such housing, therefore, is affordable housing within the meaning of 42 U.S.C. § 5301, et seq. Relator acquired direct, personal knowledge of the non-public information alleged herein as a result of threats made against him and his company, HEDCO, by the Mayor, personally, during the Mayor's illegal and harassing entry onto property owned by HEDCO. Further information was obtained as a result of an investigation initiated by Relator regarding the policies and practices of the City of Woonsocket and its Mayor.

This investigation followed and was precipitated by the harassing and threatening visit by the Mayor. Prior to Relator's report to the government of the original source knowledge amassed by Relator there has been no public disclosure of the transactions giving rise to this complaint and upon which it is based. Such transactions are the specific, false claims of Defendants contained in each of the consolidated and action plans filed with HUD beginning fiscal year 2000-2001 through fiscal year 2004-2005 (also known as the Consolidated Five (5) Year Plan) and Consolidated Annual Performance and Evaluation Reports, shown to be false in light of the true policies of Defendants and the subsequent receipt of money from HUD to which Defendant City would not otherwise be entitled but for such false statements. In fact, Defendants have taken action to prevent disclosure of their false statements to HUD by the means specified herein at ¶ 3. At no other time and at no other place has the falsity of the representations of Defendants been publicly divulged. Relator herewith seeks payment to him of the maximum amount of money allowed by law as recovered from Defendants herein together with reasonable attorney's fees, costs and expenses.

9.          Defendant City is a municipality within the State of Rhode Island, bordered by the Commonwealth of Massachusetts. Compared with other municipalities in the State of Rhode Island, Woonsocket is a poor city. It is littered with empty and ageing nineteenth century mill buildings. The majority of residential housing stock consists primarily of individual one-family dwelling units on individual lots and densely populated multiple residence apartment buildings. Unemployment is high. There is a large resident population of low and moderate income families and individuals, which also includes minorities, the disabled and the elderly. There is a homeless population.

The need for affordable housing is great.  As a result of its size and demographic profile, the City of Woonsocket receives money from HUD on an "entitlement" basis.  Because of its entitlement status Woonsocket is notified yearly by HUD of a likely funding allocation under the CDBG and other programs. The City must then file appropriate applications representing that such money will be used in accord with applicable statutes and regulations.    As a result of its status as one of the few entitlement communities in Rhode Island, Woonsocket is exempted from oversight by state officials.    Other communities must submit applications for CDBG funding through the Rhode Island Office of Municipal Affairs (hereinafter "OMA"), which is also responsible for auditing and monitoring of program activities and expenditures.

10.        Defendant Mayor is chief executive officer of the City and, as such, is the signatory of all statements, assurances and certifications made for or on behalf of Defendant City, filed with HUD and referred to herein.

11.        Defendant Joel D. Mathews is Director of Planning and Community Development for Defendant City of Woonsocket.    As such, he is responsible for submission of applications for federal community development assistance and for implementation of programs thereby funded.

12.        Defendant Paulette Miller is Assistant Director of Planning and Community Development for Defendant City of Woonsocket.  She formerly held the title of Grants Administrator.  As such, under the direction of Defendant Mathews, she is responsible for submission of applications for federal community development assistance and for implementation of programs thereby funded.

7

13.        Defendant Owen Bebeau is Director of Human Services for Defendant City of Woonsocket.

14.        Defendant Michael Annarumo serves in the dual posts of Director of Administration and Director of Public Works for Defendant City of Woonsocket. He has previously served in the position of Director of Public Safety.


### *Nature of the Federal Programs Implicated*


15.        The programs herein implicated find their origins in the "new federalism" first promoted during the Nixon presidency.

16.        "Although President Nixon intended to devolve a greater degree of decision making to states and localities, the changes that occurred during his administration have been credited with ultimately expanding federal intervention in state and local government activities. This new block grants and revenue sharing gave the federal government more influence over state and local policymaking because the federal government placed conditions on the use of funds. Funds could be reduced or withheld if the recipient government failed to meet certain specified conditions. Some observers believe that since block grants and general revenue sharing brought federal aid into many communities for the first time, "New Federalism" enabled the federal government to have more influence over American society than ever before." *Report for Congress, Federal Grants to State and Local Governments: A Brief History, Congressional Research Service, The Library of Congress, February 19, 2003, CRS-10.*

17.    Accordingly, there is federal interest in how such block grant money is spent, and any misstatement regarding the spending of such money is material to a determination of whether any federally imposed contingency has been met.

18.    As a vehicle to determine compliance by municipalities and to insure that objectives are met, HUD has implemented a comprehensive planning process. "Throughout the 1990's, HUD has required local jurisdictions to prepare formal strategies or plans as a condition for receiving federal housing funds. More specifically, the National Affordable Housing Act of 1990 requires states and local jurisdictions that receive HOME funding to develop a Comprehensive Housing Affordability Strategy (CHAS). In 1993 HUD linked the CHAS requirement to planning and administrative requirements for other programs creating the Consolidated Plan (ConPlan). These planning requirements are intended to encourage communities to allocate federal housing resources—in conjunction with state and local funding—to address local needs and market conditions. *Planning to Meet Local Housing Needs: The Role of HUD's Consolidated Planning Requirements of the 1990's, The Urban Institute, Submitted to U.S. Department of Housing and Urban Development, Contract No. GS-23F-8198H, December, 2002, p. 1-1.*

19.    "To obtain HUD funds, however, local governments have always been required to prepare plans for how they will use them and to submit those plans to HUD ahead of time. HUD can withhold approval if it finds the plans do not meet basic content and processing requirements..." *Supra, p. 2-1.*

20.    **"The development of the housing affordability strategies is intended to direct the allocation of limited resources to the most effective actions, to**

coordinate the full array of public and private housing actions toward specific objectives and to provide a mechanism for public participation and review (emphasis added)." *Supra, p. 2-6.*

### *Facts*

21.     Although ongoing since the mid 1990's, Defendant's deception was not outwardly apparent to Relator until the Spring of 2004 when Defendant Mayor verbally expressed her bias against Section 8 housing to Relator's employees.  Section 8 housing is a form of affordable, subsidized housing.  On May 17, 2004 Mayor Susan Menard called the offices of HEDCO in Woonsocket, Rhode Island and demanded that "someone who is not a dummy" meet her at HEDCO owned and operated affordable housing properties located at 136, 142, 156 and 160 Fourth Avenue, Woonsocket, Rhode Island.  Defendant Menard spoke with HEDCO employee, Rosie Cruz, manager of HEDCO's Woonsocket properties.  Defendant Menard began the conversation by threatening to shut down the properties at 152-160 Fourth Avenue because Defendant Menard claimed she had been receiving "a lot of phone calls" about the behavior of tenants.   Ms. Cruz was offended by the rude conduct of Defendant Menard, who concluded the conversation by saying that, if necessary, she would "speak to HEDCO owner Gordon Ondis…" and "…and you know how we get along" were her final words.

22.     On May 17, 2004 at approximately 2:21 PM, HEDCO employees Joyce Peno and Roger Sawyer went to the HEDCO properties located at 136,142, 156 and 160 Fourth Avenue, Woonsocket, Rhode Island.   Almost immediately Ms. Peno and Mr.

Sawyer witnessed the arrival of two men in a car. The two men were identified as Housing Inspector Thomas Koback, Sr. and Leo Cote, another inspector. Mr. Koback stated that he did not know why the Mayor had asked the inspectors to go to the HEDCO properties inasmuch as those properties were well maintained. While waiting for the Mayor to arrive, Koback and Cote, followed by Sawyer, went into the hallway at 142 Fourth Avenue whereupon, after a physical/visual inspection, Mr. Koback commented that "the properties looked good."

23.        Shortly thereafter Defendant Menard arrived. Spurning the proffered introduction of Ms. Peno, Defendant entered upon HEDCO's property at once yelling and subsequently stating "I'll shut all these houses down and take away all the Section 8s". Section 8 is an affordable housing program administered by HUD. Defendant Menard then made reference to alleged complaints regarding tenant conduct. Ms. Peno asked for copies of such reports. None were produced.

24.        During her tirade, Defendant stated: "If I had my way I would get rid of all the Section 8s in the city!"

25.        Witnesses to the childish spectacle orchestrated by Defendant Menard recall her making the following statements:

"I'm going to close down these houses."

"I'm tired of Gordon's run down properties."

"I'm going to get rid of all these Section 8 tenants."

"If I had my way I'd get rid of all the vouchers in this city."

"I'll shut down all these properties and take away the Section 8."

11

"I have numerous complaints of loud music, parties, outside drinking and other disturbances."

"You'll get copies of the complaints, don't worry."

26.        Despite the promise to provide copies of the complaint, and despite requests by counsel for Relator, Defendant Mayor has refused or been unable to produce a single document to support her unwarranted raid and physical trespass onto HEDCO's property and her attempt to intrude into the business affairs of HEDCO.  In fact, Defendant Mayor has refused to produce any complaints regarding the conduct of tenants at the subject HEDCO properties and has invoked provisions of state law allegedly excepting citizen correspondence with elected officials from a public records request served upon Defendant by Relator's counsel.

27.        Moreover, a search and review of police complaint files revealed no pertinent complaints filed with the Woonsocket Police Department.  Additionally, the city inspectors ordered to the HEDCO properties by Defendant Menard confirmed, in a subsequent interview, that there were no outstanding housing violations at the time of the visit to the HEDCO properties by Defendant Menard.

28.        In fact, Defendant Menard's threats against Relator and his company, as providers of affordable, subsidized housing, were but the latest in a series of affirmative acts by Defendant Menard on behalf of Defendant City of Woonsocket to dissuade, discourage and/or  harass providers of affordable, subsidized housing in furtherance of the policy of the City of Woonsocket to reduce  existing affordable housing and to prevent development of additional affordable, subsidized housing within the community

12

in contravention of the  representations, assurances, statements and certifications made
to HUD as a condition of receipt of federal funds.

29.        Pursuant to the Housing and Community Development Act of 1974, as
amended, such anti-affordable housing policy adopted and espoused by Defendants is
diametrically opposed to the policy required of municipalities for receipt of funds under
the CDBG and other programs administered by HUD.  Other such programs include the
Home Investment Partnership Program, Safety First! Home Repair Cost Assistance, and
SAVE Homebuyer Assistance (collectively referred to as "HOME"), and the Emergency
Shelter Grant (referred to as "ESG") program to provide emergency housing for
homeless citizens.  Federal law requires that municipalities pursue national goals in their
communities that, *inter alia*, promote—not discourage—affordable housing for low and
moderate income citizens.

30.        Since its fiscal year 2000-2001, the City of Woonsocket has received
approximately $12.5 million in federal funds as a result of a series of knowingly false
assurances, statements and certifications submitted by Defendants on behalf of
Defendant City to HUD at its regional offices at 10 Causeway Street, Boston,
Massachusetts.  Such false assurances, representations, statements and certifications
were and are conditions of awards to Defendant City of CDBG monies and other federal
funds.

31.        Had Defendants truthfully disclosed that they were pursuing a policy of
dissuading and harassing affordable, subsidized housing providers and were taking
official action toward the goal of reducing affordable, subsidized housing and blocking
development of additional affordable, subsidized housing, Defendant City would not

13

have been eligible to receive Community Development Block Grant money or other federal aid.    Conversely, if HUD officials been made aware of the true policy of Defendants was in total contravention of the national objectives of the CDBG and other federal aid programs as mandated by statute and regulation,   they would have been prohibited from disbursing such monies to Defendant City by operation of law.

32.        Defendants' false, affirmative assurances, statements and certifications that Defendant City was implementing a public policy which was, in truth, totally opposed to Defendants' true public policy, induced HUD to award funds to Defendant City which  HUD would otherwise have been required to deny statutorily.

33.        By knowing submission of patently false representations assurances, statements and certifications, Defendants induced and caused HUD to honor the false claims of Defendant City for receipt of CDBG, HOME and ESG program monetary awards.  Additionally, by knowingly failing to disclose the true public policy adopted and implemented by Defendants, Defendants induced and caused HUD to honor the false claim of Defendants for receipt of CDBG, HOME and ESG program monetary awards.

### *The Statutory and Regulatory Requirements for Receipt of HUD Community Development Block Grant Funds*

34.        In establishing the CDBG program the Congress of the United States made findings and established goals for municipalities.  In pertinent part the Congress declared:

14

"The primary objective of this title and of the community development program of each grantee under this title is the development of viable urban communities by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 USC § 5301(c).

35.        In furtherance of the national objective of affordable housing and decent living environment, HUD promulgated regulations requiring municipalities, including Defendant City, to submit plans stating how such municipalities proposed to use federal funds to achieve the national objective.

36.        Such municipalities, including Defendant City, are required by Federal regulations to submit to HUD a strategic plan covering five years of activity in furtherance of the national goal. 24 CFR § 91.215. This plan is also known as a consolidated plan in that it contains program activity for the first year of the five year period. The Consolidated Plan is required to contain a Comprehensive Housing Affordability Strategy ("CHAS") that specifies housing needs and priorities within the municipality.

37.        Defendant City did, in fact, prepare and submit such a consolidated plan to HUD in April, 2000. Such consolidated plan contained the CHAS provisions as well as the first year action plan.

38.        In addition, Federal regulations require such municipalities to file yearly action plans in which such municipalities represent to HUD how federal money will be spent on a yearly basis in furtherance of the national objective. 24 CFR § 91.220. Defendant City's first action plan was filed concurrent with Defendant City's ConPlan in April, 2000.

39.        Defendant City has, in fact, filed such annual action plans in four successive annual submissions to HUD subsequent to filing its original Strategic or ConPlan in the spring of 2000.

40.        In each annual submission to HUD, federal regulations require that municipal officials execute certifications to assure HUD that the requirements of the CDBG Program and other federal programs making financial aid available to municipalities are met.   24 CFR § 91.225.

41.        As a condition of federal funding, such certifications must be "satisfactory to HUD."  24 CFR § 91.225(a).

42.        *Inter alia,* such certifications require municipalities to assure HUD that the municipality's present and future activities are consistent with representations, assurances, statements and certifications submitted to HUD and that the municipality is following and would continue to  follow the consolidated plan submitted to HUD.  A municipality receiving CDBG, HOME and ESG money, such as Defendant City, is also required to certify that it is complying with a detailed citizen participation plan and that it is affirmatively acting to further fair housing.

43.        Defendant City filed such certifications annually for each of the fiscal years beginning with the fiscal year 2000-2001 through 2004-2005.   Each annual certification was executed for and on behalf of Defendant City by the Mayor, Defendant Susan Menard.

          As well, each year Defendant City also filed a Consolidated Performance and Evaluation Report for each of the fiscal years including the fiscal years 2000-2001

through 2003-2004 confirming that the certifications referred to in each of the Annual Plans had been adhered to.

44.          Each and every such certification referred to herein in ¶43 and filed with HUD by Defendants Menard et al. for and on behalf of Defendant City is false and each such certification was relied upon by HUD officials in making cash disbursements to Defendant City.

45.          Additionally, the consolidated plan and annual action plans filed by Defendant City contain other additional false assurances, false representations and false statements intended to assure HUD that Defendant City is, was, and would continue to remain in compliance with various federal requirements for funding.

46.          As part of its monitoring program HUD requires communities who receive funds under the CDBG and other related federal programs to file an annual self evaluation report known as Consolidated Annual Performance and Evaluation Report ("CAPER").  The purpose of such annual self-evaluations are to inform HUD of the progress made by recipients of federal funds in achieving national objectives including the provision of affordable, decent housing to all citizens.  Defendants have, in fact, submitted such CAPERs reports annually to HUD.   Such CAPERs reports have failed to disclose to HUD that the Defendants have been involved in implementation of a public policy in opposition to the national objectives they pledged to implement in Woonsocket in exchange for the receipt of federal funds.

### *The False Statements of Defendants to HUD*

47.　　　On May 5, 2000, Defendants began their present pattern of deception for the purpose of obtaining federal funds to which they are not entitled.  In a letter dated May 5, 2000, addressed to James H. Barnes, Director, US Department of Housing and Urban Development at the Thomas P. O'Neill Federal Building, 10 Causeway Street, Boston, Defendant Paulette Miller, at that time grants administrator for Defendant City, assured Mr. Barnes that Defendant City's consolidated plan represented a "unified vision" for community development with the statutory goals of "decent housing, suitable living environment and expanded economic opportunities."  The letter further (falsely) assures HUD that the plan will "as with any valuable strategy…be continually reviewed, measured and amended as necessary."

48.　　　On May 15, 2000 and on May 3, 2000 Defendant Mayor personally signed applications for federal assistance that accompanied Defendant City's consolidated plan and was filed with HUD in Boston, Massachusetts.

49.　　　In its consolidated plan Defendants made the following statements for the purpose of assuring HUD that the municipal policy of Woonsocket, Rhode Island would expend federal funds in support of the national objectives including provision of affordable, decent housing:

　　　　　a.　　　"HUD reports that despite six years of unprecedented economic growth, millions of families still struggle to secure decent and affordable housing. Rather than benefit from the surging economy, the report states, low-income renters spend years waiting to obtain rental assistance. As indicated by the number of families

on Woonsocket public housing and assisted housing waiting lists, low income residents of Woonsocket are in a similar position. This indicates a need for more rental subsidies in Woonsocket." *Consolidated Plan 2000-2005, City of Woonsocket, Rhode Island, p. 16.*

      b.    "Due to a lack of large assisted units, it is especially difficult for large families in Woonsocket, and elsewhere in Rhode Island, to find affordable housing." *Supra at 16.*

      c.    "Despite the fact that Woonsocket has median rents below the statewide median rent many Woonsocket residents still cannot afford rental housing." *Supra at 18.*

      d.    "This need (disproportionate impact on minorities) will be addressed by making assistance available to large families and minorities and expanding housing opportunities for these groups to alleviate overcrowding and to provide a wide range of housing choice as an alternative to concentrations of minorities." *Supra at 24.*

      e.    "The City will continue to link the development of affordable housing with social services as part of its neighborhood revitalization strategy." *Supra at 31.*

      f.    "Affordable housing opportunities for extremely low-income families and individuals are limited in Woonsocket. Woonsocket has traditionally relied on public and assisted housing to house its extremely low-income population that is not homeless and does not have special needs. Woonsocket will continue to use these programs to meet the needs of extremely low-income households. Due to unpredictable federal funding, Woonsocket will take steps to preserve the existing affordable housing

stock throughout the city. Obstacles to preserving existing affordable housing include Section 8 expiring contracts and expiring use developments." *Supra at 32.* Section 8 is a federal subsidy program for affordable, subsidized housing.

g.      "The City of Woonsocket will continue to advocate for the preservation of affordable housing and assess opportunities to secure additional rental assistance if and when it becomes available...Where feasible, the City will evaluate whether to apply for additional vouchers to augment the supply of affordable housing throughout the city and will recommend that other agencies apply where appropriate." *Supra at 32.*

h.      "A decrease in housing units and disinvestment in neighborhoods runs counter to the strategies articulated in this Consolidated Plan." *Supra at 34.*

i.      "Woonsocket has assigned a relative need of 'high' to all extremely low income households because of the limited supply of affordable housing available to these households. The needs of Woonsocket's extremely low income households will continue to be addressed through Federal rental assistance, public housing and grant programs." *Supra at 38.*

j.      "Due to the City's shortage of affordable rental housing, increasing housing opportunities for families remains a high priority in Woonsocket. Within the rental housing category both small related and large related households received high priority in each income category. This is due to the shortage of family assisted housing available in Woonsocket's current housing stock, as described in the Housing Needs and Homelessness Assessment." *Supra at 38.* This assertion responds to the requirements of the National Affordable Housing Act of 1990 for adoption of a

20

Comprehensive Housing Affordability Strategy. The validity of Defendant City's false assertion is certified by Defendants as referenced herein at ¶ 43.

k.      "As discussed in the Housing and Homelessness Needs Assessment, there is a need for more affordable housing throughout Woonsocket and all of Rhode Island. This includes general rental assistance as well as rental assistance for specific populations." *Supra at 43.* This assertion responds to the requirements of the National Affordable Housing Act of 1990 for adoption of a Comprehensive Housing Affordability Strategy. The validity of Defendant City's false assertion is certified by Defendants as referenced herein at ¶ 47.

l.      "The City's long term objective is the development of a viable urban community by providing decent housing; a suitable living environment; and expanding economic opportunity principally for persons of low and moderate income." *Supra at 53.*

m.      "As discussed in the Housing and Homelessness Needs Assessment, there is a need for more affordable housing throughout Woonsocket and all of Rhode Island. This includes general rental assistance as well as rental assistance for specific populations." *Consolidated Plan 2000-2005 – Section 4 – amended 6-20-00, City of Woonsocket, RI, p. 6.*

n.      "Woonsocket will also continue to advocate for vouchers, where appropriate, for people and families with disabilities as they continue to become available from HUD." *Supra at 7.*

o.      "In Rhode Island resistance to affordable housing may exist in neighborhoods which are zoned exclusively for single-family use. In the past decade,

Woonsocket has updated its Zoning Ordinance to allow for Mixed-Use Residential zones which promotes affordability and convenience to renters.  The City also has a Residential Planned Development zone to allow for the flexible development of large tracts of residential land.  The rapid growth of the 1980's resulted in widespread antigrowth movements, which lead to revised zoning and subdivision regulations.  Size requirements, coupled with the high cost of land, make development of affordable housing difficult." *Consolidated Plan 2000-2005, City of Woonsocket, Rhode Island, p. 56.*

        p.     "All program records remain available for public access.  Major reports and submittals are made available for public review and comment through public notices and hearings in accordance with Woonsocket's Citizen Participation Plan." *Supra at 64.*

        q.     "Resources from private and non-Federal public sources that are reasonably expected to be made available to address the needs identified in the plan include debt financing, equity, expertise, materials, donations are critical elements of Woonsocket's affordable housing agenda.  Major sources of private investment include the Woonsocket Neighborhood Development Corporation…" *Supra at 65.*

        r.     "Woonsocket is committed to reducing the number of families living in poverty.  It is widely recognized that affordable housing must be linked with supportive social services or the cycle of homelessness and poverty will continue." *Consolidated Plan 2000-2005 – Section 7  – amended 6-29-00, City of Woonsocket, RI, p. 4.*

s.    "The primary objective of this program is 'the development of viable urban communities by providing decent housing, a suitable living environment and expending economic opportunities; principally for persons of low and moderate income.'" *Consolidated Plan 2000-2005, City of Woonsocket, Rhode Island, p. 73.*

50.    In the consolidated plan, Defendants make the following specific certifications to induce HUD to provide funds, to which they would otherwise not be entitled, to Defendant City:

a.    "The housing activities to be undertaken with CDBG, HOME and ESG, funds are consistent with the strategic plan." Such certification is signed by Defendant Mayor and is dated May 3, 2000, and is referenced herein at ¶43 and ¶47.

b.    The entitlement community "is in full compliance and following detailed citizen participation plan that satisfies the requirements of 24 CFR 91.105." Such requirements include a mandate that records regarding applications to HUD be made public and accessible. Such certification is signed by Defendant Mayor and is dated 5/3/00. The Citizen Participation Plan submitted to HUD states "Citizens, public agencies and other interested parties will be provided with reasonable and timely access to information and records relating to the jurisdiction's consolidated plan and the jurisdiction's use of assistance under the programs during the preceding five years." *Citizen Participation Plan – amended 9/30/99, p. 5.*

c.    "Its consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objective that provide decent housing, expand economic opportunities primarily for persons of low and moderate income." Such

certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47.

        d.      "It is following a current consolidated plan (or Comprehensive Housing Affordability Strategy that has been approved by HUD." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47.

        e.      "With respect to activities expected to be assisted with CDBG funds, it (Defendant City) certifies that it has developed its Action Plan so as to give maximum feasible priority to activities which benefit low and moderate income families or aid in the prevention or elimination of slums or blight." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47.

        f.      "The aggregate use of CDBG funds...shall principally benefit persons of low and moderate income..." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47.

        g.      "The grant will be conducted and administered in conformity with Title VI of the Civil Rights Act of 1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and implementing regulations." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47.

        h.      "It (Defendant City) will comply with applicable laws." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47.

        i.      "The use of HOME funds for tenant-based rental assistance is an essential element of the participating jurisdiction's consolidated plan for expanding the

supply, affordability and availability of decent, safe, sanitary and affordable housing."
Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to
herein at ¶43 and ¶47.

51.    In its Consolidated Plan Defendants made the following statement for the
purpose of assuring HUD that the public would have access to the documents submitted
to HUD:

"When completed, copies of the Consolidated Plan, as submitted to
HUD, will be sent to the Woonsocket Public Library. The Consolidated Plan will also
be available to private citizens upon request." *City of Woonsocket, RI -- Consolidated
Plan 2000-2005, p. 6.*

52.    In the Executive Summary to its 2000-2005 Consolidated Plan,
Defendants continue their pattern of deception:

a.    "The city recognizes its growing minority populations. It pledges
that all of its programs will include proactive, positive and inclusionary efforts to
promote housing choice in all areas of the city." *City of Woonsocket, RI -- Consolidate
(sic) Plan 2000-2005 Executive Summary, p. 4.*

b.    "Woonsocket seeks to balance assisting those families and
individuals most in need of housing with supporting programs that allow for greater
homeownership opportunities. To make the city's vision a reality, the city is seeking to
make it possible for low-income individuals and families to inhabit safe, decent, and
affordable housing. *Supra at 5.*

c.    "Woonsocket's housing priorities emphasize the need to use
existing structures, whether they are occupied or abandoned. The city takes a variety of

25

approaches to accomplish this goal and apply it to all segments of the city's population. Among its high priorities are to "...provide rental assistance for cost-burdened households and individuals." *Supra at 6.*

        d.    "A critical element of the city's affordable housing agenda is the use of private resources in debt financing, equity, donations of housing materials and land, and expertise." *Supra at 7.*

53.       Defendants, in order to secure funds allocated to Defendant City as an "entitlement community" were required, in addition to the filing of a five year consolidated plan, to file annual "action plans". Concurrent with the filing of its consolidated plan Defendant City filed its first action plan effective July 1, 2000. Such action plan reflects the same false statements and assurances contained in the consolidated plan:

        a.    "The primary objective of this program is 'the development of viable urban communities by providing decent housing, a suitable living environment and expanding economic opportunity; principally for persons of law and moderate income. '" *Consolidated Plan, 2000-2005, City of Woonsocket, Rhode Island, p. 73.*

        b.    "Within the framework of the national objectives, the City of Woonsocket has set forth a Consolidated Plan that generally identifies the City's Housing and non-housing community development needs and objectives." *Supra at 73.*

54.       Defendants filed an action plan effective July 1, 2001 -- June 30, 2002. Upon belief, Defendants proffered the same false statements, assurances, representations and certifications as contained the plan filed with HUD for July 1, 2000 – June 30, 2001 and in the action plans submitted in the three years subsequent. Contrary to the

26

certification of Defendant Mayor, no copy of this action plan was available at the Woonsocket Public Library.  In addition, HUD has reported that it no longer has a copy of the action plan for the fiscal year July 1, 2001 – June 30, 2002, nor does it have available the Consolidated Action Performance and Evaluation Report for the same period of time, the fiscal year July 1, 2001 – June 30, 2002.

55.         Defendants filed an Annual Action Plan effective July 1, 2002 – June 30, 2003 containing the same false representations, assurances and certifications as were contained in the first year action plan for the period July 1 2000 – June 30, 2001 and, upon belief, the plan filed for the fiscal year July 1, 2001 – June 30, 2002:

        a.         "We look forward to maximizing the alliance the City has forged with the Department of Housing and Urban Development and other valuable partners.  It is through this integration of resources that Woonsocket will achieve the intended public purpose."  *Cover letter dated May 9, 2002 addressed to Mr. James H. Barnes, Director, US Department of Housing and Urban Development, which accompanied the Annual Action Plan submitted to HUD.*

        b.         "In an effort to ensure the planning process includes the most comprehensive information available about the City's community development needs, the Division interfaces with the agencies on a regular basis.  Additionally, the Division conducts formal open consultations with the agencies to collect feedback and suggestions.  The agencies are invited to participate in community development related public hearings, as well."  *City of Woonsocket, Rhode Island Annual Action Plan July 1, 2002 – June 30, 2003 p.8.*

c.    "Affordable housing opportunities for extremely low-income families and individuals are limited in Woonsocket. *Supra at 9.*

d.    "Woonsocket has traditionally relied on public and assisted housing to house its extremely low-income population that is not homeless and does not have special needs. Woonsocket will continue to use these programs to meet the needs of extremely low-income households. Due to unpredictable federal funding, Woonsocket will take steps to preserve the existing affordable housing stock throughout the city. Obstacles to preserving existing affordable housing include Section 8 expiring contracts, expiring use developments, and the cost of lead reduction." *Supra at 10.*

e.    As well, the following general certification was included in the annual Action Plan for 2002-2003, signed May 3, 2002 by Mayor Susan D. Menard on behalf of the City of Woonsocket:

"The jurisdiction will affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard.

f.    The following specific CDBG certification was included in the annual Action Plan for 2002-2003, signed May 3, 2002 by Mayor Susan D. Menard on behalf of the City of Woonsocket:

"Its consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objectives that provide decent housing, expand economic

opportunities primarily for persons of low and moderate income. (See CFR 24 570.2 and CFR 24 part 570)."

   g. &ldquo;Although 16 percent of Woonsocket's housing stock is subsidized in some form by the government, greater numbers of people are paying more than 35 percent of their income on housing costs. According to the 1990 census, 27 percent of renter households paid more than 35 percent of their household income for housing costs, an increase of 15 percent from 1980. Households that pay more than 28-30 percent of their income on housing costs are considered cost burdened. This cost burden especially affects very low-income residents.

   City households with severe cost burdens (those paying more than 50 percent of their income for housing costs) automatically meet the Woonsocket Housing Authority's (WHA's) preference for admittance to subsidized developments or participation in the certificate or voucher program. The WHA estimates that one-half to three-quarters of their waiting list meets this standard." *City of Woonsocket Rhode Island Annual Action Plan July 1, 2002-June 30, 2003, Executive Summary, p.3.*

   h. &ldquo;High property taxes have also become a burden to homeowners, first-time buyers, and renters. Exemptions are granted for those with special needs, but this affects only a small portion of the population. The city recognizes this barrier and is exploring a proposal to grant property tax relief for residents who buy and renovate abandoned homes." *Supra at 4.*

   i. &ldquo;The City recognizes its growing minority population. It pledges that all of its programs will include proactive, positive, and inclusionary efforts to

promote housing choice in all areas of the city. It admits, however, that there are some neighborhoods where these efforts fall short." *Supra.*

       j.    Woonsocket seeks to balance assisting those families and individuals most in need of housing with supporting programs that allow for greater homeownership opportunities. To make the city's vision a reality, the city is seeking to make it possible for low-income individuals and families to inhabit safe, decent, and affordable housing. Through a network of Federal and State programs, opportunities will be provided that make it more affordable for more people to own their homes throughout the city. Because maintenance on the older homes is expensive, the city will also assist low-income homeowners who want to stay in their homes." *Supra at 5.*

       k.    "Woonsocket's housing priorities emphasize the need to use existing structures, whether they are occupied or abandoned. The city takes a variety of approaches to accomplish this goal and apply it to all segments of the city's population." *Supra at 6.*

       l.    "The city seeks to break the cycle of poverty by developing social competence and self-sufficiency while ensuring that basic services for survival are provided. Woonsocket will assist the homeless in obtaining appropriate housing, assist those at risk of becoming homeless, and increase and retain the affordable housing stock for low and very low-income families." *Supra.*

56.    Defendants filed an Annual Action Plan and Application for Federal Assistance effective July 1, 2003 – June 30, 2004 containing the same false representations, assurances, statements and certifications:

30

a.    In a cover letter dated May 9, 2003 to Mr. James H. Barnes, Director of US Department of Housing and Urban Development Office of Community Planning and Development, 10 Causeway Street, Boston, Massachusetts, Defendant City (over the signature of Deputy Director of Housing and Community Development, Paulette Miller) assured HUD that a "unified vision for community development actions was identified." The letter further falsely confirmed that the city's plan for spending federal money was adopted "keeping in mind the statutory program goals of decent housing, suitable living environment and expanded economic opportunities."

b.    The formal Applications for Federal Assistance, HUD-424, were personally executed by Defendant Mayor for and on behalf of Defendant City on May 9, 2003.

c.    "The high-priority needs for FY 2003-2004 were identified during the 5-Year Consolidated Plan needs assessment process. They are: affordable housing, neighborhood revitalization through park and commercial building improvements, roadway reconstruction, and improvements to neighborhood facilities. The health, education, and general welfare needs of low to moderate-income residents are also considered priorities." *City of Woonsocket, R.I. Action Plan 2003 -2004, p.5.*

d.    "Mayor Menard, as the chief elected official for the City, is entrusted with the ultimate responsibility for the carrying out of the action plan. She has designated the Development Division as the lead agency to administer the CDBG, HOME, and ESG funds, which constitute the majority of the resources dedicated to the implementation of the plan." *Supra at 10.*

31

e.    "Woonsocket will continue to use these programs to meet the needs of extremely low-income households.  Due to unpredictable federal funding, Woonsocket will take steps to preserve the existing affordable housing stock throughout the city.  Obstacles to preserving existing affordable housing include Section 8 expiring contracts, expiring use developments, and the cost of lead reduction." *Supra at 11.*

f.    "There is a continuing need to assist individuals and families who fall below poverty thresholds.  Of particular concern within the City are the needs of infirm elderly and poverty-stricken families with children.  The City funds numerous programs that seek to alleviate poverty among these subgroups...Therefore, the City will continue to emphasize and support anti-poverty strategies that attempt to prevent homelessness or substandard housing conditions." *Supra at 29.*

g.    "In 1996, the city conducted an analysis of impediments to fair housing choice.  Since that time, the city has carried out actions to overcome the effects of the identified impediments." *Supra at 33.*

h.    "The city has reviewed the policies, procedures, and practices within the city that affect the location, availability, and accessibility of housing and current residential conditions related to fair housing choice." *Supra at 33.*

i.    As well, the following general certification was included in the Annual Action Plan for 2003-2004, signed May 9, 2003 by Mayor Susan D. Menard on behalf of the City of Woonsocket:

"The jurisdiction will affirmatively further fair housing, which means it will conduct an analysis  of impediments to fair housing choice within the jurisdiction,

32

take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard."

        j.     Further, the following specific CDBG certification was included in the Annual Action Plan for 2003-2004, signed May 9, 2003 by Mayor Susan D. Menard on behalf of the City of Woonsocket:

        "The housing activities to be undertaken with CDBG, HOME, and ESG funds are consistent with the strategic plan." and "Its consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objectives that provide decent housing, expand economic opportunities primarily for persons of low and moderate income. (See CFR 24 570.2 and CFR 24 part 570)."

        k.     "The city's housing supply has grown slowly. The current supply of rental housing is threatened because of a slow economic growth and a growing trend against investing in the city's older neighborhoods. A recent study found that approximately 400 subsidized rental units may be lost to the private market, because the owners may prepay their government-backed mortgages and could then rent the units at market price." *City of Woonsocket, RI Action Plan for 2003-2004 Executive Summary, p.2.*

        l.     Although 16 percent of Woonsocket's housing stock is subsidized in some form by the government, greater numbers of people are paying more than 35 percent of their income on housing costs. According to the 1990 census, 27 percent of renter households paid more than 35 percent of their household income for housing costs, an increase of 15 percent from 1980. Households that pay more that 28-30

percent of their income on housing costs are considered cost burdened. This cost burden especially affects very low-income residents.

"City households with severe cost burdens (those paying more than 50 percent of their income for housing costs) automatically meet the Woonsocket Housing Authority's (WHA) preference for admittance to subsidized developments or participation in the certificate or voucher program. The WHA estimates that one-half to three-quarters of their waiting list meets this standard." *Supra at 3.*

m.    "A study of the city's homeless found that the largest segment of this population (40 percent) is families. The second largest group of homeless is women who are fleeing an abusive relationship and their children. The remaining and growing segment of the homeless population is single men with substance abuse problems or mental illness.

The city will continue to address homelessness through a cooperative Continuum of Care effort developed by the State of Rhode Island's Interagency Council. The Interagency Council coordinates the statewide Continuum of Care planning process…" *Supra.*

n.    "The WHA manages 1291 units of housing for elderly households and families. The WHA has a total of six housing developments; all are considered to be viable for the next 20 years.

"In addition, there are units subsidized by the Rhode Island Mortgage Finance Agency, Federal Sections 202, 221, 236 and Section 8 Moderate Rehabilitation programs. In all, 16 percent of the housing stock is government subsidized. There are over 300 families on the public housing waiting list." *Supra.*

34

o.    "High property taxes have also become a burden to homeowners, first-time buyers, and renters. Exemptions are granted for those with special needs, but this affects only a small portion of the population. The city recognizes this barrier and is exploring a proposal to grant property tax relief for residents who buy and renovate abandoned houses." *Supra at 4.*

p.    "The city recognizes its growing minority population. It pledges that all of its programs will include proactive, positive and inclusionary efforts to promote housing choices in all areas of the city." *Supra.*

q.    "The city has reviewed its policies, practices, procedures within the city that affect the location, availability, and accessibility of housing and current residential conditions related to fair housing choice. Specifically, the city examined the new, relevant demographic information and data; sources of authoritative studies of housing discrimination, lending, and other fair housing issues; methods for obtaining diverse citizen participation in the development, implementation, and evaluation of fair housing planning; and correction actions and solutions." *Supra.*

r.    "Woonsocket seeks to balance assisting those families and individuals most in need of housing with supporting programs that allow for greater homeownership opportunities. To make the city's vision a reality, the city is seeking to make it possible for low-income individuals and families to inhabit safe, decent, and affordable housing. Through a network of Federal and State programs, opportunities will be provided that make it more affordable for people to own their own homes throughout the city. Because maintenance on the older homes is expensive, the city will also assist low-income homeowners who want to stay in their homes." *Supra at 6.*

s.      The city's high priorities are described as "…rehabilitation of both renter and owner occupied housing in all income areas; providing necessary financial and or supportive services that allow elderly residents to remain in their homes; providing assistance to low income families to help them buy homes in targeted areas; providing rental assistance for cost-burdened households and individuals; expanding housing opportunities for the population with special needs through renovation structures." *Supra at 6.*

t.      "The city seeks to break the circle of poverty by developing social competence and self sufficiency while ensuring that basic services for survival are provided.  Woonsocket will assist the homeless in obtaining appropriate housing, assist those at risk of becoming homeless, and increase and retain the affordable housing stock for low- and very low-income income families." *Supra.*

u.      "A critical element of the cities affordable housing agenda is the use of private resources in debt financing, equity, donations of housing materials and land, and expertise.   Major sources of private investment have included:   the Woonsocket Neighborhood Development Corporation, a local community housing development organization; the United Way, which contributes support services for emergency housing and homeless support services; local banks; and volunteers." *Supra at 7.*

v.      The Woonsocket Department of Planning and Development will implement CDBG, ESG, and HOME Program funds. The WHA implements the rental certificate and voucher programs and other housing assistance grants…" *Supra.*

36

57.         Defendants filed an Annual Action Plan and Application for Federal Assistance effective July 1, 2004 – June 30, 2005 containing the same false representations, assurances and certifications as well as significant information as to such false information supplied to HUD:

        a.         In a cover letter dated May 11, 2004 to Robert Paquin, Director of the Office of Community Planning and Development, 10 Causeway Street, Boston, Massachusetts, Defendant City (over the signature of Deputy Director of Housing and Community Development, Paulette Miller) assured HUD that a "unified vision for community development actions was identified."   The letter further falsely confirmed that the city's plan for spending federal money was adopted "keeping in mind the statutory program goals of decent housing, suitable living environment and expanded economic opportunities."  As in similar letters written in each of the prior three years, this letter avers that the "...Plan will be continually reviewed, measured and amended as necessary."

        b.         The formal Applications for Federal Assistance, HUD-424, were personally executed by Defendant Mayor for and on behalf of Defendant City.

        c.         "Mayor Menard, as the chief elected official for the City, is entrusted with the ultimate responsibility for the carrying out of the action plan.  She has designated the Development Division as the lead agency to administer the CDBG, HOME and ESG funds..." *City of Woonsocket, RI. Action Plan 2004-2005, p. 11.*

        d.         Again, in 2004, Defendants give the same assurances to HUD as they did in 2000, 2001, 2002, and 2003 regarding their falsely promised efforts to cultivate assisted housing.  "Woonsocket has traditionally relied on public and assisted

housing to house its extremely low income population that is not homeless and does not have special needs. Woonsocket will continue to use these programs to meet the needs of extremely low-income households. Due to unpredictable federal funding, Woonsocket will take steps to preserve the existing affordable housing stock throughout the city. Obstacles to preserving existing, affordable housing include Section 8 expiring contracts, expiring use developments, and the cost of lead reduction." *Supra at 12.*

    e.    "As identified in consultation with the Woonsocket Housing Authority, priority uses for public housing include…increased assisted housing choices." *Supra at 30.*

    f.    Defendants analyze impediments to fair housing and assert that they have "reviewed the policies, procedures and practices within the city that the affect the location, availability and accessibility of housing and current residential conditions related to fair housing choice." They disclose no findings of city policies that affect fair housing opportunities. *Supra at 34.*

    g.    Defendant City, as in years previous, again certifies falsely to the same facts specified in ¶57a - ¶57f herein. Such certifications are signed personally by Defendant Mayor, Susan Menard, and are dated May 10, 2004.

### *The True Policies and Practices of Defendants*

58.    Despite the continued representations and assertions to HUD to the cumulative and continuing effect that Woonsocket recognized the need for additional low and moderate income subsidized housing (referenced herein at ¶49a – ¶49i) and

intended to undertake and support efforts to provide more such housing, the truth is that since 1995, the City of Woonsocket, spearheaded under the leadership of Defendant Menard, has adopted and implemented policies and practices attempting to limit such housing in Woonsocket, and instead, promote gentrification of the area at the expense of such housing.

59.     Despite representations and assertions to HUD that Woonsocket recognized limited affordable housing opportunities and would take "steps" to preserve existing affordable housing stock throughout the city (referenced herein at ¶48f), such "steps" were not undertaken.

60.     Despite representations and assertions to HUD that Woonsocket would continue to advocate for the preservation of affordable, subsidized housing (as referenced herein at ¶49), Defendant City, has, in fact, undertaken certain policies and actions which have, instead, reduced or limited the number of units of affordable housing within the city.

61.     Despite representations to HUD that Woonsocket would support and address the needs of the homeless population, as well as the needs of other specific populations (referenced herein at ¶49k - ¶49n) the city has only recently undertaken only minimal support in this regard through its recently established ESG program, implemented in 2003, while actively choosing to discourage other organizations from opening and operating homeless shelters (without regard to eligibility for ESG assistance).

62.     Despite representations and assertions to HUD that Woonsocket had updated its Zoning Ordinance to allow for mixed-use residential zones which promote

39

affordability and convenience to renters (as referenced herein at ¶ 49o) and the inference inherent therein that the City would utilize this tool to support and promote affordable, including subsidized, housing, the City has, in fact, in more than one instance, acted to limit development of additional affordable, subsidized housing using zoning regulation as its tool.

63.        Despite representations and assertions to HUD that Woonsocket seeks to follow a policy of inclusionary efforts to" promote housing choice in all areas of the city" as referenced herein at ¶ 52a,  the City, has, in fact, by its actions, acted in contravention to this assertion.

64.        Despite representations and assertions to HUD that Woonsocket "seeks to balance assisting those families and individuals most in need of housing with supporting programs that allow for greater homeownership opportunities...to inhabit safe, decent, and affordable housing...provide rental assistance for cost-burdened households and individuals". *City of Woonsocket, RI –Consolidated (sic) Plan 2000-2005 Executive Summary*, p.5-6, and referenced herein at ¶ 52c.  Defendant City has not fulfilled its pledge and has failed to inform HUD of its failure.

65.        Despite representations and assertions to HUD in its Consolidated Five Year Plan and in each of its annual Action Plans  beginning with the plan filed effective July 1, 2000 and each July 1 thereafter (as referenced herein at ¶47 - ¶57) and in contravention of each CAPERs filed subsequent, Defendant City has not taken "steps to preserve the existing affordable housing stock throughout the City," but has, instead, taken steps that served to reduce, diminish, and decrease the actual number of available units of affordable and subsidized housing stock in the City of Woonsocket.

66.        Despite the City's statement to HUD in its Consolidated Plan, previously referenced herein at ¶51, that the public would have access to the documents submitted to HUD, Defendants have failed to make such documents available to private citizens.

67.        Thus, Defendants' continued statements, assurances and certifications that they have and will support the national objectives of the CDBG program and other federal aid programs are false and were intended to obtain monies from HUD to which Defendant City would not otherwise be entitled.

68.        Defendants' true policy was outlined on January 30, 2004 by, Woonsocket's Director of Human Services, Owen  T. Bebeau in a report to the Woonsocket City Council. Owen Bebeau is an appointee of Defendant Mayor. Defendant Mayor is the immediate supervisor of Owen Bebeau.  Mr. Bebeau is also the person who chauffeured  Defendant Mayor to the HEDCO properties where she delivered her threats and harassed affordable housing provider HEDCO as referred to herein at ¶ 21 - ¶ 26.

69.        Reacting to a preliminary draft of a report prepared by Rhode Island Housing and Mortgage Finance Corporation (hereinafter "RIHMFC") – Rhode Island's state housing agency – to the effect that Woonsocket had lost the distinction of having the greatest number of low and moderate income housing units in the state, Bebeau credited manifestation of this change to the moratorium Defendant Mayor had put in place against such affordable, subsidized housing beginning upon her election in 1995.

70.        The RIHMFC report concluded that Woonsocket's quantity of low and moderate income housing fell behind Newport, Rhode Island when it dropped from 16.97 percent to 16.53 percent.  According to the memo Bebeau wrote to members of

41

the City Council, this amounted to a loss of 166 units of low to moderate income housing.

71.        Crowing about Defendant City's "accomplishment" of reducing the low and moderate income housing stock, Bebeau referred to the "stance" of Defendant Mayor aimed at restricting the growth of subsidized housing.   The "moratorium" in such housing was undertaken because Defendant City had allegedly done "more than its share of meeting the burden of providing affordable housing."

72.        At no time has Defendant City informed HUD of its policy to restrict and reduce affordable, subsidized housing for low and moderate income residents.  Such a policy is in direct contravention of the national objectives of HUD and of the CDBG program--objectives Defendant Mayor certified Defendant City was pursuing and implementing as part of the applications to receive federal funds from HUD.  Moreover, the significance of the statement by Defendant Bebeau of the true policy of Defendants would not have been ascertainable because of the inability of citizens to review documents submitted to HUD in comparison to the municipal policy statement annunciated by Defendant Bebeau on behalf of the other Defendants herein.  Such inability has been caused by Defendants' failure to file such documents at the Woonsocket Public Library as promised to HUD, by Defendants' refusal to release such documents as demonstrated by the response to such request by counsel for Relator referenced herein at ¶124 - ¶130, and other correspondence, respectively, and by Defendant City's change in policy with respect to filing and storing of Zoning Board Records.

73.          Incredibly, in light of Defendants' often repeated statements of support of affordable, subsidized housing in accord with the national objective, Owen Bebeau explained Defendant Mayor's policy: "Woonsocket has reached its peak in regards to these units and her (Defendant Mayor's) administration would no longer support projects" that would increase affordable, subsidized housing.

74.          The memorandum written by Owen Bebeau to the Woonsocket City Council was requested by the council members when a Providence, Rhode Island developer came forth with a proposal to build 160 apartment units in late 2003 which would have utilized a portion of a parcel of city-owned property. Again, contrary to its promises to HUD to encourage housing development, and in keeping with its true policy, the city council discouraged the apartment construction plan, and instead, sold a parcel of the City-owned land to Wal-Mart Real Estate Business Trust, permitting expansion of an existing Wal-Mart store on the same property.

## Frustration of the Not-For-Profit Affordable Housing Efforts

75.          A thorn in the side of Defendant Mayor in her efforts to frustrate development of affordable housing in her poor city, the Woonsocket Neighborhood Development Corporation (hereinafter "NDC") is a private, not-for-profit entity dedicated to developing and operating affordable housing within Woonsocket in keeping with the national objectives.

76.          Since the founding of NDC in the early 1990's Defendant Mayor has tried to hinder the corporation's effort to provide affordable housing in Woonsocket.

43

The very first project NDC undertook was in the Mayor's neighborhood. At that time, the Mayor was a councilwoman. Then Councilwoman Menard opposed the project on the basis that affordable housing should not be built in a "nice" neighborhood. She used the prospect of NDC's project for affordable housing as a political issue to assist her in obtaining name recognition and political stock.

77.     By the time NDC was beginning Phase 2 of its successful Constitution Hill project in 1995, Defendant Mayor had assumed office as the city's chief executive. The Constitution Hill project is comprised of approximately one-third Section 8 voucher tenants wherein the Woonsocket Housing Authority, using HUD funds, subsidizes rents for low and moderate income citizens. Defendant Mayor attempted to block Phase 2 of the Constitution Hill project and asked Richard Godfrey, Director of the state housing agency, RIHMFC how she might do so and how he might assist her.

78.     NDC next undertook a Home Ownership Development program by creation of a land subdivision. This process began in the late 1990's. From the beginning Defendant City, through the policies spearheaded by Defendant Mayor, created obstacles to the creation of additional affordable, subsidized housing opportunities. Among those was a claim that a zoning exception had expired. The NDC sued and its case was remanded by the Rhode Island Superior Court to the city's zoning authority. Again Defendant City balked and a second lawsuit was filed in Superior Court. Finally, the Court overruled the zoning authorities and allowed the NDC affordable housing project to proceed. Still intent on interfering with the project, Defendant Mayor wrote one or more letters continuing to threaten the project. One such letter threatened to deny water service to the project. These letters were written in 2001

44

just before subdivision construction began and during the pendency of Defendant City's consolidated plan.

79.        In order to further frustrate the efforts of NDC, Defendant City funded, in 2003, through the CDBG Program, a competing not-for-profit housing corporation operating under the aegis of the Woonsocket Housing Authority.  CDBG funds for emergency housing were diverted to the newly established, politically controlled entity.

80.        Most recently, NDC has attempted to build and operate a homeless shelter.  A building permit was issued in the Spring of 2004 until Defendant Mayor became aware of the permit.  Without legitimate cause, a cease and desist order was thereupon issued to NDC upon instruction of Defendant Mayor.


## Entrepreneurial Builders of New, Affordable, Subsidized Housing Need Not Apply


81.        Woonsocket is a densely packed city of tenements and neighborhood storefronts.  Opportunities to construct affordable housing on relatively large tracts of land  are not often presented.

82.        As early as June, 1999, Defendant City was applying its double standards in furtherance of its then unstated policy with respect to affordable, subsidized housing. Excel Management, Inc. applicant, and City of Woonsocket, as owner, requested a zoning variance for renovation/construction of a small four unit structure consisting of three bedroom units, to be funded by a program of Defendant City.  During the meeting of the Zoning Board to examine the application, it was repeatedly affirmed to the Board by the applicant (who had previously successfully completed another renovation project

45

funded by Defendant City) that the building units would be "affordable" but not "subsidized" housing, and would not accept Section 8 applicants. Said variance was granted, based on the inference (but without stipulations) that the building would not become subsidized housing within the meaning herein.

83.        Another such opportunity (referred to herein at in ¶ 74 ) was presented in late 2003. Rather than encouragement in constructing affordable housing in the putative Diamond Hill Road project, the potential developer was told Defendant City preferred Wal-Mart to troublesome poor people. Zoning was the defensive club used to beat off the affordable housing proposals so offensive to Defendants. As heinous as this conduct might be, Defendant City's actions did not constitute the first time an opportunity to provide significant numbers of affordable housing units in furtherance of its promises to HUD had been intentionally squandered through the predatory zoning practices specifically decried in Defendants' statements to HUD.

84.        In May, 2001—even as Woonsocket's second annual action plan was being submitted to HUD--The Aspen Group of North Reading, Massachusetts and Mill Woonsocket Associates Limited Partnership of Chestnut Hill, Massachusetts were anxious to build two hundred fifty-two (252) apartment units on former industrial property located on Mill Street, Woonsocket. The project was to be known as River Bend. In order to undertake such construction a use variance and a dimensional variance were required.

85.        Rather than viewing such a proposal as a unique and rare opportunity to fulfill its promises, assurances and certifications to HUD, Defendants immediately

began to plot ways to insure fulfillment of Defendants' policy of limiting subsidized housing as explained by Owen Bebeau and as referenced herein at ¶ 68 -¶ 71.

86.         Accordingly, on May 29, 2001, following advocacy by the administration of Defendant Mayor, the Woonsocket Zoning Board of Appeals, in Decision #4902, granted the use and dimensional variances requested subject to several significant stipulations.

87.         First, Defendant City required a stipulation to be implemented by a covenant or deed restriction to the effect that the project could never be used for federally subsidized housing.

         *"Stipulation 1:  Grant is subject to the recording in the Woonsocket Registry of Deeds, before construction begins, of a covenant/restriction that would prevent this development from becoming federally subsidized housing at any time in the future; said covenant/restriction shall be in the form as finally approved by the Administration and the Applicant."*

88.         Next, despite Defendants' having submitted its Comprehensive Housing Affordability Study to HUD as part of the consolidated plan, despite that plan finding a need for housing units for families needing multiple bedrooms and despite certifying specifically to HUD that local public policy would operate consistent what that plan, Defendants took action to require that River Bend would not be able to serve such needy families.  An additional stipulation of the River Bend Decision #4902 required:

         *"Stipulation 3:   A minimum of twenty percent (20%) of the total number of units must be one-bedroom units."*

89.         Finally, the Zoning Board of Review, acting on recommendation of the
administration of Defendant Mayor, eliminated any hope that large families would find
homes at River Bend:

    *"Stipulation 5: The development can have only one-bedroom and two-
bedroom units."*

90.         Construction on this project was begun in February, 2003. Ironically, by
Spring of 2004, after construction was completed, the project was in financial distress
because of inability to fully lease the unsubsidized, expensive apartments. Michael
Annarummo, Woonsocket's Administration/Public Works Director and a close associate
of Defendant Mayor, stated to the press upon learning of the economic distress: "The
rents are too high. I said that from the day they came in here and everybody laughed at
me...This isn't Cumberland (an adjacent, affluent community)."

91.         Just one month before the River Bend project was considered by the
Zoning Board of Appeals another potential apartment developer ran into opposition
from the city administration based upon speculation that economic distress might force
the developer to turn to subsidies. Andola Fibres, Ltd., of Kingston, Ontario, Canada
applied to build 48 apartments in four twelve unit buildings on a 4.7 acre wedge of land
bounded by Diamond Hill Road and Fulton Street.

92.         City Planning Director Joel D. Mathews, whose department is charged
with implementation of Defendant City's comprehensive and action plans, stated on
April 9, 2001 that the city administration opposed the construction of these apartments
because city officials feared it would become a subsidized housing tract.

48

93.        Planning Director Mathews on the same day acknowledged that the developer had not proposed building subsidized housing but contended that "the ability to rent it or other failures in the development process" would result in subsidized housing.

94.        Despite being assigned the task, as a department director, of implementing Defendant City's implementation of the national housing objectives in exchange for receipt of HUD cash, Matthews then asserted that Defendant Mayor's administration is opposed to subsidized housing "in principle."

95.        These statements were being made at the same time the Woonsocket 2001-2002 action plan in implementation of Woonsocket's consolidated plan was being assembled by Defendants in anticipation of submission to HUD.

96.        When Andola Fibres, Ltd.'s application was finally approved by the Zoning Board on June 11, 2001, stipulations required that the Grant **be subject to the recording in the Woonsocket Registry of Deeds before construction begins, of a covenant/restriction that would prevent this development from becoming federally subsidized housing at any time in the future; said covenant/restriction shall be in the form as finally approved by the Administration and the Applicant (emphasis added)."**

97.        While this particular project has been subject to construction delays and has yet to come to fruition, each annual application for renewal of the required zoning variance subsequent to June 11, 2001 has been approved subject to the very same restrictive covenants/stipulations that would prevent the development from becoming federally subsidized housing at any time in the future.

98.        By contrast, developers proposing luxury housing in Woonsocket are quickly embraced and their projects are endorsed by Defendants without hesitation.  For example, in October, 2002, developer Constitution Holding, Inc., a Rhode Island corporation, approached the Woonsocket Council for a zone change that would allow conversion of the former Bancroft Sporting Goods Co. into approximately forty-five (45) "high end" condominiums.    A zone change is a departure from city development policy even more radical than the variances sought by the developers of River Bend. The application was filed two years into implementation of Defendant City's Consolidated Plan.

99.        Planning Director Joel D. Mathews effused about the new project and commented that the luxury housing units fit in with Defendant Mayor's plan to revitalize the Social District of Woonsocket.

100.        The city administration recommended approval subject to a restriction that would limit the development to one and two bedroom condominiums.  This policy, Planning Director Mathews advised the zoning board, would keep families with children from moving into the development.  Defendant City, Matthews explained to the Zoning Board, was trying to maximize the advantage of new housing while keeping educational costs contained.

        No mention was made of the conclusion of the Defendant City's CHAS study, authored by Defendant Matthews's department and submitted to HUD, that there was existing priority need in Woonsocket for large families.  No notice was taken of the City's prior assertion to HUD that "...Due to a lack of large assisted units, it is especially difficult for large families in Woonsocket, and elsewhere in Rhode Island, to

find affordable housing..." as previously referenced herein at ¶ 49b. The provision of affordable, subsidized, decent housing for these families would not have increased the educational cost burden already shouldered by Defendant City.

101.     This extraordinary statement by Defendant Mathews on behalf of Defendant City was made two years into alleged implementation of Defendant City's consolidated plan that, according to law, identified Woonsocket's alleged strategy to provide housing for families.   Even more extraordinary is that such statement was made by the individual who headed the department responsible for implementing Defendant City's promises to HUD in exchange for community development funding.

## Defendants' Fight to Remove Tax Incentives to Subsidized Housing

102.     Just as the purpose of Defendant Mayor's harassing and threatening visit to Relator's Fourth Avenue properties was to dissuade Relator from continuing to provide subsidized housing opportunities to Woonsocket's low and moderate income citizens, so too was her attack on tax policies favorable to subsidized housing providers.

103.     In the midst of the Rhode Island General Assembly's 2003 legislative session, Defendant Mayor undertook her second yearly attempt to repeal favorable tax treatment for owners/entrepreneurs if they had invested in "substantial rehabilitation" of housing units made available for rent to subsidized tenants.

104.     The state statute, RIGL 44-5-13.11, provides that owners who have rehabilitated slum properties would pay property taxes restricted to eight (8) percent of the prior year's gross rent receipts.    Implementation of the statute by Defendant City

51

would further its goals stated in the consolidated plan and affirmed yearly in Defendant City's action plan submitted to HUD in exchange for community development funding.

105.    Rather than take steps to encourage development of additional subsidized housing, Defendants sought to change the law without notice to HUD regarding its true policy toward affordable housing.

106.    Over a period of two years, in attempting to eliminate the tax incentive for rehabilitation of housing, Defendants argued that Woonsocket was already providing sufficient housing and should be required to do no more.   Such an argument is directly contrary to the statements, assurances and certifications made to HUD.

107.    In the Spring of 2002, Defendants sought to overturn the incentive tax policy toward housing rehabilitators by judicial action.  Defendant City filed an action in Rhode Island Superior Court to challenge two housing partnerships that had claimed the tax incentive for ninety-one (91) housing units in the Constitution Hill development. The partnerships—named Securing the Future and Reclaiming the Vision-- are affiliated with Woonsocket Neighborhood Development Corporation, the much disfavored not-for-profit entity from which Defendants had previously withdrawn financial support.

108.    Not surprisingly, the anti-housing effort of Defendants was rebuffed by the Court.  The Court found for the partnerships and ordered the city to repay $45,000 the Court concluded had been unlawfully collected by Defendant City.

109.    The efforts of Defendants in 2002 and in 2003 to remove tax incentives for creation of affordable housing in Woonsocket contrary to statements, assurances and certifications made to HUD were the continuation of the anti-affordable, subsidized housing policy adopted by Defendant Mayor when she assumed office in 1995—almost

52

five years before Defendants filed their sham consolidated plan with HUD Boston officials.

110.        In May, 1997 Defendant Mayor, as part of Defendant City's budget, undertook an elimination of homestead tax exemptions previously made available to properties with ten (10) or more housing units.  Typically, such properties would consist of, in part, subsidized housing.

111.        The elimination of such tax exemptions would have the effect of increasing tax assessments—and thus taxes—by twenty-five (25) percent.

112.        Principally affected was the Ferland Corporation, owner of Four Seasons North and Diamond Hill Apartments, two housing properties including a total of five hundred sixty-eight (568) units.  Forty percent of those units in 1997—or two hundred twenty-seven (227) units—were subsidized.

113.        In the exchange between Ferland and Defendant Mayor that followed the proposal to eliminate the tax exemption, Ferland accused Defendant Mayor of attempting to balance the city budget on the back of one property owner.  Defendant Mayor responded that Ferland was lucky to have had the tax exemption for the limited time it was in effect.

## Defendants Provide No Help In Keeping Section 8
## Project Based Subsidized Housing

114.        In the late 1990's housing officials across the country were concerned about the forthcoming expiration of contracts with Section 8 housing project developers/managers.  These contracts had largely been entered into for provision of

53

subsidized housing on a project basis in the 1970's.    Government officials feared that entrepreneurs would walk away from continuing to provide subsidized, affordable housing in favor of more lucrative private investment.

115.        Nowhere in the nation was this problem more acute than in Woonsocket, Rhode Island where, in the 1970's, former U.S. Representative Fernand St. Germain lived and held sway. St. Germain was the Chair of the House Sub-Committee on Housing, responsible for oversight of HUD.  As such, St. Germain's hometown was the beneficiary of what is commonly known in Washington, D.C. as "pork" in the form of hundreds of units of subsidized housing.

116.        With the prospect the contracts with entrepreneurs expiring, what had been a boon to Woonsocket and the entire Rhode Island First Congressional District would now become a disaster in the form of thousands of poor, elderly, and handicapped families and individuals thrown into a housing market place that could not now accommodate them.

117.        Working with HUD, the Rhode Island state housing agency, RIHMFC, began to study the problem of entrepreneurs desiring to remove themselves from the operation of Section 8 subsidized housing projects.  The response was the "Mark to Market" program in which RIHMFC sought to determine the fair market value of rental housing and to seek to adjust subsidies paid to entrepreneurs accordingly.

118.        Defendants were asked to assist in avoidance of a housing calamity by working with Section 8 entrepreneurs and encouraging their continued participation in subsidized housing programs.

119.       In its consolidated plan Defendant City promises to do just that.    In reality, because of its fundamental, institutional policy of dissuading and discouraging subsidized and affordable housing, Defendants not only did not encourage entrepreneurs to continue to provide affordable, subsidized housing but continued to pursue their policy of dissuasion and harassment.

120.       Relator's company, HEDCO, is, currently, the single largest provider of large family housing units in Woonsocket.    Despite this distinction, HEDCO did not receive a single communication from any city official to encourage it to continue participation in the Section 8 project based programs.


### Harassment of HEDCO By Defendant Mayor Not An Isolated Incident


121.       Just one week before Defendant Mayor entered Relator's Fourth Avenue properties (referred to herein at ¶¶21 – 26)  uttering threats and harassing, she undertook similar harassment action and made similar threats regarding another Woonsocket subsidized housing provider.

122.       On or about May 11, 2004 Defendant Mayor, in conversation with Leslie McKnight of RIHMFC, began to threaten the operations of Woonsocket Village, another group of housing units providing subsidized housing opportunities.    The statements of Defendant Mayor to Ms. McKnight about Woonsocket Village were uncannily similar to those made about HEDCO and described in ¶¶ 21-26 herein.

123.       On May 12, 2004, Ronald P. Trottier, Regional Manager of Bay Management Corp., the manager of Woonsocket Village, wrote to Defendant Mayor in

documentation of her tirade against Woonsocket Village.    "We have recently been made aware of your conversation with Rhode Island Housing Mortgage Finance Corporation regarding Woonsocket Village.  We appreciate your interest and welcome the comments made available to us by RIHMFC," wrote Trottier sarcastically.

### Records of Defendant Representations to HUD Not Made Public; Evidence of False Representations to HUD Made Inaccessible.

124.        On July 20, 2004 counsel for Relator wrote to Defendant Mayor asking, *inter alia,* for:

**"Any submission, endorsement, approval, communication submitted, directly or indirectly, to any federal or state agency, signed or authorized by you, in which Section 8 housing subsidies are addressed, sought, rejected, approved or mentioned."**

125.        Defendant City's Consolidated Plan and subsequent action plans signed by Defendant Mayor and submitted to the Boston offices of HUD, are clearly and unambiguously are included in this request.  The Consolidated Plan and the Action Plans repeatedly and continuously refer to Section 8 and other housing subsidy programs, as do the CAPERs.

126.        In its Citizen Participation Plan submitted to HUD as certified to by Defendant Mayor, Defendants represented:    **"Citizens, public agencies and other interested parties will be provided with reasonable and timely access to information and records relating to the jurisdiction's consolidated plan and the**

**jurisdiction's use of assistance under the programs during the preceding five years."** *Citizen Participation Plan – amended 9/30/99, p. 5.*

127.       In a letter dated July 29, 2004, Woonsocket City Solicitor Joseph Carroll, acting as legal counsel for Defendant Mayor, responded to the specific document request herein as follows:  **"Any such document, if it exists, would be within the custody of the City Clerk or, alternatively, would be exempt under the previously stated statute.   Please submit Request #4 to the appropriate department."**

128.       Thus, in total contravention of representations made and certified by Defendant Mayor to HUD that records submitted to HUD would be public, her legal representative obfuscated and demurred when asked for those records. Instead of providing the records that now appear so embarrassing and damaging to Defendants in light of documentation of their true conduct, Defendant Mayor's legal representative suggested that such records might be exempt from disclosure and directed Relator's counsel to a city department without responsibility for the submission of documents to HUD.

129.       Such obfuscation and demurrer on the behalf of the legal representative of Defendant Mayor, in contravention of the statements, assurances and certifications to HUD, were for the purpose of hiding, secreting and keeping from public view the false nature of those same statements, assurances and certifications made to HUD.

130.       In fact, in the preparation of this complaint Relator's counsel was forced to obtain documents directly, as filed, in the Boston office of HUD.   It was only after city officials learned that Relator's counsel was obtaining records from HUD's Boston

office that they disingenuously offered to provide access to their files as required by law and as represented to HUD.

131.        Despite assurances to HUD that the consolidated plan and yearly action plans would be made available to the public for viewing at the Woonsocket Harris Public Library, such is not the case.    Librarians at the Woonsocket Harris Public Library have no recollection of ever having received any such documents.  The catalog system of the Woonsocket Harris Public Library contains no references to such documents.   Moreover, other potential public document storage facilities to which such documents may have been moved or filed have no record of such documents or receipt of such documents.  These include the Rhode Island State Library, the Rhode Island Archives maintained by the Rhode Island Secretary of State and the Providence Public Library.

132.        An equal impediment to citizen access to the full panoply of Woonsocket housing policy was elimination of the physical paper records of the Zoning Board of Review proceedings and replacement with tape recordings of meetings.  Other than meeting agendas, there is no index to such recordings and speakers generally are not identified on such tapes.  Thus, persons who might wish examine discussions in board proceedings for the purpose of comparing actual city housing policy with that professed in documents submitted to HUD (or for any other purpose) are required to undertake a laborious task of listening to full discussions in lengthy meetings without the ability to discern one speaker from another.    Thus it appears that Defendant City and Mayor Menard et al. have conspired to preclude the public from access and review of documents both directly and tangentially related to housing matters.

*Statement of Claims*

## COUNT ONE

### False Claims Act

133.        Plaintiff reasserts the allegations contained herein in ¶¶ 1-132 and incorporates them by reference.

134.        This is a *Qui Tam* civil action brought by Gordon Ondis and the government of the United States to recover treble damages and civil penalties under 31 U.S.C. § 3729(a)(1-2) of the False Claims Act.

135.        Defendants have violated 31 U.S.C. § 3729(a)(1-2) of the False Claims Act on multiple occasions on divers dates between January 1, 2000 and the present in that they have willfully and intentionally :

        a)        submitted false and/or fraudulent claims for payment to an officer and employee of the United States government; and

        b)        made, used or caused to be made or used, a false record or statement which caused a false or fraudulent claim to be paid by the Government.

136.        In reliance on these false claims, the United States Government, by and through the Department of Housing and Urban Development, awarded grants and other Federal funds to Defendant City of Woonsocket, Rhode Island.

137.        As a proximate result of the conduct of Defendants the United States Government has been damaged in an amount in excess of **TEN MILLION DOLLARS**, exclusive of interest, multiple damages, fees, costs and expenses.

138.        Relator Ondis is a private person with direct and independent knowledge of the allegations of this complaint who has brought this action pursuant to 31 U.S.C § 3730(b) on behalf of himself and the United States Government.

WHEREFORE, Relator Ondis respectfully requests this Court to award the following damages to the following parties and against Defendants as follows:

To the UNITED STATES GOVERNMENT:

a)        **three times** the amount of actual damages the United States Government has sustained as a result of the fraudulent practices of Defendants;

b)        a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which each defendant submitted to the United States Government;

c)        prejudgment interest; and

d)        all costs of this action.

To RELATOR ONDIS:

a)        **30% of the proceeds of this action, pursuant to 31 USC § 3730(d)**;

b)        reimbursement of the expenses which Relator incurred in connection with this action;

c)        award of reasonable attorneys' fees;

d)        costs and disbursements  this action;

e)        such other relief as the Court deems lawful and just.

## COUNT TWO

### Conspiracy to Defraud the United States Government

139.     Plaintiff reasserts the allegations contained herein in ¶¶ 1-132 and incorporates them by reference.

140.     This is a *Qui Tam* civil action brought by Gordon Ondis and the government of the United States to recover treble damages and civil penalties under 31 U.S.C. § 3729(a)(3) of the False Claims Act.

141.     Defendants have violated 31 U.S.C. § 3729(a)(3) of the False Claims Act on multiple occasions on divers dates between January 1, 2000 and the present in that they did willfully and intentionally conspire among themselves and in concert with other conspirators yet unnamed for the purpose of defrauding the Government by getting a false or fraudulent claim allowed or paid and that they did willfully and intentionally, on divers dates between January 1, 2000 and the present, engage in overt acts in furtherance of that conspiracy.

142.     As a result of such conspiracy and as a result of the overt acts taken in furtherance of that conspiracy the United States Government, by and through the Department of Housing and Urban Development, overpaid Defendant City of Woonsocket, Rhode Island.

143.     As a proximate result of the conduct of Defendants the United States Government has been damaged in an amount in excess of **TEN MILLION DOLLARS**, exclusive of interest, multiple damages, fees, costs and expenses.

144.        Relator Ondis is a private person with direct and independent knowledge of the allegations of this complaint who has brought this action pursuant to 31 U.S.C § 3730(b) on behalf of himself and the United States Government.

WHEREFORE, Relator Ondis respectfully requests this Court to award the following damages to the following parties and against Defendants as follows:

To the UNITED STATES GOVERNMENT:

e)        **three times** the amount of actual damages the United States Government has sustained as a result of the fraudulent practices of Defendants;

f)        a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which each defendant submitted to the United States Government;

g)        prejudgment interest; and

h)        all costs of this action.

To RELATOR ONDIS:

**f)        30% of the proceeds of this action, pursuant to 31 USC § 3730(d);**

g)        reimbursement of the expenses which Relator incurred in connection with this action;

h)        award of reasonable attorneys' fees;

i)        costs and disbursements  this action;

j)        such other relief as the Court deems lawful and just.

## COUNT THREE

### Common Law Conspiracy

145.        Plaintiff reasserts the allegations contained herein in ¶¶ 1-132 and incorporates them by reference.

146.        Defendants did, illegally and in violation of the common law of the Commonwealth of Massachusetts and/or the State of Rhode Island,  on multiple occasions on divers dates between January 1, 2000 and the present, willfully and intentionally conspire and agree amongst themselves and with other conspirators yet unnamed, for the purpose of defrauding the Government by getting a false or fraudulent claim allowed or paid and that they did willfully and intentionally, on divers dates between January 1, 2000 and the present, engage in overt acts in furtherance of that conspiracy.

147.        As a result of such conspiracy and as a result of the overt acts taken in furtherance of that conspiracy the United States Government, by and through the Department of Housing and Urban Development, overpaid Defendant City of Woonsocket, Rhode Island.

148.        As a proximate result of the conduct of Defendants the United States Government has been damaged in an amount in excess of TEN MILLION DOLLARS, exclusive of interest, multiple damages, fees, costs and expenses.

## COUNT FOUR

### Unjust Enrichment

### (as against Defendant City of Woonsocket, Rhode Island only)

149.    Plaintiff reasserts the allegations contained herein in ¶¶ 1-132 and incorporates them by reference.

150.    As a result of the conduct of all Defendants the City of Woonsocket, Rhode Island has been unjustly enriched.

151.    Such unjust enrichment is in violation of the common law of the Commonwealth of Massachusetts and/or that of the State of Rhode Island.

152.    As a result of such unjust enrichment the United States Government, by and through the Department of Housing and Urban Development, has been damaged.

153.    As a proximate result of the conduct of Defendants the United States Government has been damaged in an amount in excess of TEN MILLION DOLLARS, exclusive of interest, multiple damages, fees, costs and expenses.


WHEREFORE, Plaintiff Gordon F.B. Ondis hereby pledges to use any funds recovered in this action in furtherance of the development and maintenance of affordable housing in the City of Woonsocket, RI; and

WHEREFORE, Plaintiff Gordon F.B. Ondis and the United States demand and pray that a judgment be entered in its favor and against Defendants on all

counts in an amount equal to the money unjustly obtained by Defendants, plus interest, costs and such other relief prayed for herein.

### *Jury Demand*

Plaintiff seeks jury trial on all issues so triable.

Respectfully Submitted,

**Government of the United States**
***ex rel.* Gordon F.B. Ondis**

BY HIS ATTORNEY,

_____
Leon A. Blais (BBO#652595)

BLAIS AND PARENT
20 Park Plaza, 4th Floor
Boston, MA 02116-4399
617 948-2660
617 812-0459 fax
LBlais@BlaisParent.com

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America ex rel
Connon Omnis

**DEFENDANTS**  City of Woonsocket, P.E., et al

**(b)** County of Residence of First Listed Plaintiff  Providence, RI
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Providence
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Black Parcet
30 Park Plaza, Boston 02116

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)  and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 USC 3729 et seq.

Brief description of cause:
False Claims Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE  2/16/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _USA ex rel Oxxis_
_City of Woonsocket, et al_

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

____  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

__X__  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,        *Also complete AO 120 or AO 121
            740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

____  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
            315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
            380, 385, 450, 891.

____  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
            690, 810, 861-865, 870, 871, 875, 900.

____  V.    150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

_____

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?
                                                   YES        (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST?    (SEE 28 USC §2403)
                                                   YES        (NO)

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                   YES         NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC §2284?
                                                   YES        (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                   YES        (NO)

   A.   IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

        EASTERN DIVISION          CENTRAL DIVISION          WESTERN DIVISION

   B.   IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

        EASTERN DIVISION          CENTRAL DIVISION          WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Gary A Blais_
ADDRESS _20 Park Plaza 4th Fl Boston MA 0216_
TELEPHONE NO. _617 948-2660_

(Cover sheet local.wpd  - 11/27/00)