# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| *ex rel*. GORDON F.B. ONDIS ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **CITY OF WOONSOCKET, RHODE** ) | |
| **ISLAND; SUSAN D. MENARD, in** ) | |
| **her individual capacity and in her** ) | **CIVIL NO. 05-10312-MLW** |
| **capacity as Mayor of the City of** ) | |
| **Woonsocket, Rhode Island; JOEL D.** ) | |
| **MATHEWS, in his individual** ) | |
| **capacity and in his capacity as Director** ) | |
| **of Planning and Community Devel-** ) | |
| **opment of the City of Woonsocket, Rhode** ) | |
| **Island; PAULETTE MILLER, in her** ) | |
| **individual capacity and in her capacity** ) | |
| **as Assistant Director of Planning and** ) | |
| **Community Development of the City of** ) | |
| **Woonsocket, Rhode Island; OWEN T.** ) | |
| **BEBEAU, in his individual capacity** ) | |
| **and in his capacity as Director of** ) | |
| **Human Services of the City of** ) | |
| **Woonsocket, Rhode Island; and** ) | |
| **MICHAEL ANNARUMMO, in his** ) | |
| **individual capacity and in his capacity** ) | |
| **as Director of Administration and Director** ) | |
| **of Public Works of the City of Woonsocket,** ) | |
| **Rhode Island;** ) | |
| ) | |
| **Defendants.** ) | |

## RELATOR'S SUPPLEMENTAL MEMORANDUM OF LAW REGARDING SUBJECT MATTER JURISDICTION

The question presented before the Court is whether Relator's claims are

barred because those claims are "based upon" public disclosures.

Relator acknowledges that he carries the burden of demonstrating subject matter jurisdiction. However, Relator contends that he has already met that burden in his complaint and exceeds the minimal requirements of demonstrating subject matter jurisdiction by the affidavits filed concurrently with this Memorandum.

Moreover, Relator argues in the alternative that public disclosure does not bar his claim because he is an "original source" within the meaning of the law.

I.    **ALTHOUGH RELATOR BEARS THE BURDEN OF DEMONSTRATING JURISDICTION, THE AVERMENTS MADE IN HIS COMPLAINT MUST BE READ IN THE LIGHT MOST FAVORABLE TO HIM AND THOSE AVERMENTS MUST BE ASSUMED TO BE TRUE. IMPORTANTLY, THE MOTION TO DISMISS IS NOT TREATED AS A MOTION FOR SUMMARY JUDGMENT.**

In considering a Rule 12(b)(1) motion to dismiss, this court must "construe the [c]omplaint liberally and treat all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences." The court may also consider extrinsic materials, which include exhibits attached to the pleadings and any evidentiary materials submitted by the parties. In doing so, this court does not convert Defendants' motion to dismiss into a motion for summary judgment. "'[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence.'" United States ex rel. Rost v. Pfizer, Inc., 446 F. Supp. 2d 6, 11 (D. Mass. 2006).

…the Court "must construe the complaint liberally, treating all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiffs." Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998). In addition, in order to determine jurisdiction, the Court can consider evidence submitted by the parties and, if necessary, settle factual disputes. See Valedon Martinez v. Hospital Presbiteriano de la Comunidad, Inc., 806 F.2d 1128, 1132 (1st Cir. 1986.); Heinrich v. Sweet, 44 F. Supp. 2d 408, 415 (D. Mass. 1999). Therefore, it is appropriate to consider supplemental materials as they are attached to the pleadings

2

before this Court. Such consideration does not, however, require the Court to treat this motion as one for summary judgment. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002) ("The attachment of exhibits to a Rule 12 (b) (1) motion does not convert it to a Rule 56 motion."). <u>Rakes v. United States, 352 F. Supp. 2d 47, 69-70 (D. Mass. 2005)</u>.

II.    **IN HIS COMPLAINT RELATOR SETS FORTH IN DETAIL THE HISTORICAL AND CONTEXTUAL BASIS FOR THIS LITIGATION.**

Relator begins to set forth the basis of his knowledge at ¶ 8 of the complaint where, inter alia, he states "Relator acquired direct, personal knowledge of the non-public information alleged herein as the result of threats made against him and his company, HEDCO, by the Mayor personally, during the Mayor's illegal and harassing entry onto property owned by HEDCO.  Further information was obtained as a result of an investigation initiated by Relator regarding the policies and practices of the City of Woonsocket and its Mayor.  This investigation followed and was precipitated by the harassing and threatening visit by the Mayor.   Prior to Relator's report to the government of the original source knowledge amassed by Relator there has been no public disclosure of the transactions giving rise to this complaint and upon which it is based."  Thus, Relator specifically avers that this suit was not based on public disclosures.

Further facts are alleged in ¶¶ 21-25 which further describe the basis for this action.

In fact, as indicated in Relator's accompanying affidavit, Mr. Ondis was not aware of the few newspaper articles cited by Defendants.

III.   **THE AFFIDAVITS ACCOMPANYING THIS MEMORANDUM PROVIDE ADDITIONAL JUSTIFICATION FOR THE EXISTENCE OF SUBJECT MATTER JURISDICTION.**

In his affidavit Relator clearly sets the history of the filing of this claim. Mr. Ondis also clearly describes his background and experience that has caused him to be uniquely situated to be able to understand the import of statements made by Mayor Menard to Relator's staff involving Section 8 housing, thus beginning the query that underlies this action.

The affidavit of Lee Matthews, former Mayor of Central Falls, Rhode Island, attests to a portion of Relator's housing related history and to the knowledge that caused him to understand that Mayor Menard's statements regarding affordable housing were at odds with commitments and representations necessarily made to obtain Community Development Block Grant funds.

Finally, the affidavit of counsel further documents the process used to obtain and collect the mountainous amount of evidence underlying the filed action.

IV.   **THERE HAS NEVER BEEN PUBLIC DISCLOSURE OF THE BULK OF THE FACTS CONTAINED IN THE COMPLAINT.**

Only a small percentage of the facts contained in Relator's voluminous complaint were contained in the newspaper articles advanced by Defendants as constituting public disclosure.

In his Memorandum of Law in support of his objection to the motion to dismiss, Relator sets out the paragraphs of the complaint not addressed in any way by the newspaper articles.   Relator's Memo at 14-15.

It is important to keep in mind that there was no disclosure in these newspaper articles of the false statements made in the multiple submissions to HUD. Indeed, Relator has described the multiple devices employed by Defendants to prevent public disclosure of the federal application materials.

Defendants have suggested that the inclusion of false statements in the submissions to the government constitutes public disclosure.   This circular reasoning, if applied, would result in a bar to all False Claims Act suits inasmuch as an essential element of the cause of action spelled out in the act if the submission of false statements or claims to the government.

> **V.     APPLICATION OF THE FORMULA ARTICULATED IN <u>SPRINGFIELD RAILWAY</u> LEADS TO THE CONCLUSION THAT PUBLIC DISCLOSURE WAS NOT THE BASIS OF THIS SUIT.**

Important is the very simple logic that the significance of newspaper articles describing elements of the Defendant City's true view and policy regarding affordable housing were meaningless without knowledge of the specific false certifications and statements made to the federal government.    And, as has been alleged, this crucial formulaic necessity was unavailable to the government or anyone else as a direct result of the conduct of Defendants until disclosed by Relator.

Indeed, application of the now famous (in FCA circles) $X + Y = Z$ formula for analysis of public disclosure leads to the inescapable conclusion that there has been no public disclosure at bar.  "In Springfield Terminal Rwy., the Court of Appeals for the District of Columbia Circuit articulated a helpful and straightforward framework for applying the jurisdictional bar of § 3730(e)(4)(A). According to that framework, "if X +

Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." 14 F.3d at 654 <u>United States ex rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 94 (D. Mass. 2001)</u>

In this case, there has been no allegation of fraud disclosed prior to this action and the crucial element of the fraud—what the government was told—has, in fact, been hidden by Defendants.   Under the formula of <u>Springfield Terminal</u> Defendants may not prevail.

Moreover, a Fourth Circuit holding left standing by the Supreme Court, lays out the standard for judging public disclosure and, in so doing, culling out parasitic claims.

> We agree that [the relator's] reading of "based upon" is the only fair construction of the statutory phrase. Section 3730(e)(4)(A)'s use of the phrase "based upon" is, we believe, susceptible of a straightforward textual exegesis. To "base upon" means "to use as a basis for." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 180 (1986) (definition no. 2 of verb "base"). Rather plainly, therefore, a relator's action is "based upon" a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based. Such an understanding of the term "based upon," apart from giving effect to the language chosen by Congress, is fully consistent with section 3730(e)(4)'s undisputed objective of preventing "parasitic" actions, . . . for it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic.  <u>United States,*ex rel.* Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1347-48 (4th Cir.), *cert. denied*, 115 S.Ct. 316 (1994).</u>

At bar, the only public discussion has occurred in just a few newspaper articles that did not at all deal with the false statements made to the government and it is clear that these articles dealt with only a few of the averments of the complaint.

The Supreme Court has interpreted the phrase "based upon" in a manner similar to the *Becton Dickinson* court. In *Saudi Arabia v. Nelson*, the Court was required to interpret a statute that provides for federal jurisdiction against a foreign state in any case "in which the action is *based upon* a commercial activity carried on in the United States by the foreign state." The Court wrote: "Although the Act contains no definition of the phrase 'based upon,' and the relatively sparse legislative history offers no assistance, guidance is hardly necessary." Resorting to dictionary definitions of the term "based upon," the Court held that a claim was "based upon" conduct only if that conduct formed the "basis" or "foundation" for the claim. Saudi Arabia v. Nelson, 113 S.Ct. 1471 (1993).

## VI.    EVEN IF THERE WAS PUBLIC DISCLOSURE, THERE IS NO BAR TO THIS ACTION BECAUSE RELATOR IS AN ORIGINAL SOURCE WITHIN THE MEANING OF THE FALSE CLAIMS ACT.

¶ 8 of the complaint specifically sets forth Relator's contention that he is an "original source", identifies the basis of such conclusion and avers facts that underlie such contention. The Court should, in accord with Rule 12 Motion to Dismiss standard of review, accept the facts pled as true and deny Defendants' motion.

As specifically averred, Relator was in a unique position to appreciate and understand the significance of Defendant Menard's words as she strode into one of his properties vowing to rid Woonsocket of Section 8 housing. Relator, is a provider of affordable housing in Woonsocket and elsewhere for many years. He has worked on preparation of applications

7

for Community development Block Grant assistance for an entitlement community similar to Woonsocket and was well aware that Woonsocket had obtained CDBG and other HUD funds. As such, he immediately understood after hearing of the Mayor's remarks from his own experience that Woonsocket could not at once be attempting to remove Section 8 affordable house and receiving Community Development Block Grant Money from HUD without making false claims to the federal government.

Relator's contention that he is an "original source" is not merely conclusory as is suggested by Defendants. The facts underlying Relator's "original source" status are specifically averred in the complaint at ¶¶ 8, 21-30.

An "original source" is defined to be "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing [suit]." 31 U.S.C. § 3730(e)(4)(B). This provision has been construed to impose a conjunctive requirement of demonstrating that the relator's knowledge is both direct and independent. See Springfield Terminal Rwy., 14 F.3d at 656. A relator's knowledge is "direct" if she acquired it through her own efforts without an intervening agency, and it is "independent" if her knowledge is not dependent on the public disclosure. See id. United States ex rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 93 (D. Mass. 2001)

The facts pled by Relator specifically and precisely comply with the definition of "original source" in O'Keeffe as cited by Defendants themselves. There are no facts that suggest that prior to the intrusion of Defendant Menard on the property of Relator there was any realization by anyone of the frauds of Defendants on the government. Moreover, there are no facts suggesting that Relator had even been aware of the existence of the few

newspaper articles provided to the Court as evidence of public disclosure. Clearly, the realization of the existence of false statements to the government came to the Relator as a result solely of the Mayor's pronouncement of her plans for affordable housing in the context of Relator's background and experience.

Interestingly, while Relator's knowledge that a fundamental fraud had occurred is based upon his background and experience, he did commission further investigation based upon his recognition of the divergence of Mayor Menard's stated intention to rid Woonsocket of affordable housing and necessary certifications to obtain HUD funds. Courts have held that even where there was no uniquely situated relator, such as Gordon Ondis, an investigation commissioned by an individual can qualify that person as a relator. "At least one court has held that knowledge obtained through an investigation can be the basis for a qui tam action. See United States ex rel. Hartigan v. Palumbo Bros., Inc., 797 F. Supp. 624, 630-31 (N.D. Ill. 1992)." United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1017 (7th Cir. 1999).

Finally, "there are situations in which a relator can derive some of his information about a fraud from public disclosures, but also have direct and independent knowledge of the alleged fraud. Thus, the original source provision does enlarge the category of persons eligible to file *qui tam* suits. The key to understanding how the two provisions work together is as   follows: a lawsuit is "based upon" a public disclosure if the relator actually derived *a significant part* of the information underlying the lawsuit from the specific public disclosure. The relator is an "original source" if, in addition to satisfying the requirement of voluntarily disclosing his information to the Government prior to

filing suit, the relator had direct and independent knowledge of *another significant part* of the information underlying the lawsuit."  24 Pub. Cont. L.J. 477

At bar, Relator avers that he had knowledge of the underlying inconsistency of the City's housing policy with required CDBG certifications gained from the Mayor's statements to his employees within the context of his long housing experience.

### Conclusion

Relator has pleaded his basis for his suit as being other than from public disclosure sources and as supplemented those averments with affidavits filed with this brief.

By no interpretation may it be contended that the instant action was based on public disclosure.   Moreover, even if it was, Relator may claim status as an original source.

A review of the legislative history of the 1986 amendments to the False Claims Act reveals that the Congress included the public source bar and the special status of original sources in order to week out opportunistic litigation.   Sought to be prevented was litigation based upon a Relator learning of false claims from public sources and racing to the court house to reap financial benefits.   Such "parasitic" litigation was initiated principally by individuals with absolutely no connection to the factual scenario underlying the claim.  At bar, Mr. Ondis is and has been for a long time intimately familiar with the requirements of housing program, whether funded by Community Development Block Grants or otherwise.   Realizing the likelihood of false statements made to the government to obtain CDBG funds he made further inquiry and discovered, as no one had previously, that the Defendants' true housing policy was not as represented, in threshold submissions, to HUD.

Gordon Ondis is not one of the opportunistic or parasitic Relators envisioned by the Congress.   He is a member of the class of individuals Congress wished to encourage to be vigilant to waste, fraud and abuse in and of federal programs.

For these reasons, Defendants Motion to Dismiss should be denied.

Respectfully Submitted,

**Government of the United States *ex rel*. Gordon F.B. Ondis**

BY HIS ATTORNEY

/s/ Leon A. Blais
_____
Leon A. Blais  (BBO#652595)

BLAIS & PARENT
20 Cabot Blvd
Suite 300
Mansfield, MA 02048
508 618-1280
866 329-6175 fax
LBlais@BlaisParent.com

**<u>Certificate of Service</u>**

The undersigned counsel hereby certifies that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.   All counsel of record are such registered participants.

Dated:  February 9, 2007                    <u>/s/ Leon A. Blai</u>

11

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* GORDON F.B. ONDIS<br><br>         Plaintiff,<br><br>         vs.<br><br>CITY OF WOONSOCKET, RHODE ISLAND; SUSAN D. MENARD, in her individual capacity and in her capacity as Mayor of the City of Woonsocket, Rhode Island; JOEL D. MATHEWS, in his individual capacity and in his capacity as Director of Planning and Community Development of the City of Woonsocket, Rhode Island; PAULETTE MILLER, in her individual capacity and in her capacity as Assistant Director of Planning and Community Development of the City of Woonsocket, Rhode Island; OWEN T. BEBEAU, in his individual capacity and in his capacity as Director of Human Services of the City of Woonsocket, Rhode Island; and MICHAEL ANNARUMMO, in his individual capacity and in his capacity as Director of Administration and Director of Public Works of the City of Woonsocket, Rhode Island;<br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     CIVIL NO. 05-10312-MLW |

## <u>AFFIDAVIT</u>

February 2, 2007

1

I, Gordon F. B. Ondis of Lincoln, Rhode Island, under the pains and penalties of perjury, depose and say as follows:

1) Neither I nor any of my associated business entities are in any manner socially, politically, or financially connected to the City of Woonsocket, or any of the named Defendants (hereinafter the "City Defendants") and as such have never stood nor will stand to profit or lose as a result of any funds the City has expended or might expend, including CDBG federal monies.

2) The City has never contributed to the benefit of any of my properties in any manner and further all of my properties are independently operated and as such do not rely on any subsidy whatsoever. Approximately 50% of tenants as of this writing are voucher based, being able to rent comparable apartment units in any locality that accepts such vouchers. The balance of tenants are "market" based.

3) Following the "episode" found within ¶¶ 21-28 of my complaint I telephoned the Director of the Woonsocket housing Authority, Steven Vadnais who, upon learning of Mayor Susan B. Menard's unprovoked police raid upon one of my properties and her comments to rid the City of Section 8 stated "no comment." I then telephoned Barry Tate, HUD, Providence and discussed the "episode" described above and he referred me to the Fair Housing Division, U.S. Department of HUD, Boston, which I telephoned only to learn that their expertise and function was regarding the renting and sale of housing and infractions of that subject matter. I then proceeded to telephone John Gordon, Director, Housing Management, Rhode Island Housing, from whom I learned that his agency was concerned regarding Woonsocket's affordable

2

housing policy. I believe the contacts stated in paragraph 2 above took place within two weeks of the visit of Mayor Menard to my property.

4) I telephoned Attorney Arthur Hessel, (HUD Specialist) and Attorney John Roney (general) and discussed the "episode" its potential consequences and the Mayor's behavior towards affordable housing and its recipients.

5) In calendar year 1992, I became acquainted with Lee M. Matthews, who subsequently became Mayor, City of Central Falls, Rhode Island (1996-2004) the nations most densely populated City holding over 17,000 residents within less than 1 square mile. During the next few months following the initial "episode" and having discussed the situation in Woonsocket with regards to affordable housing I came to no concrete conclusion at that time. Several weeks after that conversation (approximately mid 2005) now former Mayor Matthews discussed how he had been recently requested by the Inter Local Trust (a cooperative insurer) to appear as a witness within litigation that had commenced while he was in office. That particular case involved, inter alia, the application, receipt and expenditure of Community Development Block Grant (CDBG) funds. At that point I was reminded of my own involvement in the revising, crafting, editing and specific general oversight of the 1996 and subsequent years CDBG applications while aiding Mayor Matthews. I specifically remembered that the requisites for receipt of CDBG funding included i) affirmative statements representations and certifications of affording housing policy and goals and ii) very specific intended use of monies received. Jeff Gofton, Director OMA, Office of Municipal Affairs, Department of Administration, State of Rhode Island testified circa 1999, in State of Rhode Island Superior Court. (City of Central Falls vs. WDC

et al) I concluded from witnessing that testimony by Mr. Gofton that CDBG funds i) sought for a specific purpose i.e. fire truck – may not be spent on any thing else, a new car for the Fire Chief as an example. ii) Public Auditors should review all applications and report on compliance of application and spending. iii) This procedure was very similar to procedures I had followed with HUD for many years running. At this point I did not know for sure whether the "City" had ever applied for or received CDGB funds but assumed so due to its population, concentration of minorities and extremely low per capita income. Following this I contacted attorney Lee Blais with whom I had first met when he was Director of Investigations, State of Rhode Island, Attorney General Office and who had further conducted comprehensive investigations into corruption within RIMFC ( "Rhode Island Housing") over 20 years ago. Further Lee Blais and I had worked together on behalf of the City of Central Falls in 1996 wherein he conducted a fraud and compliance examination of certain subcontractors. Mr. Blais' office, through constant consultation with me, initiated inquiries that resulted in the facts and allegations contained in the present lawsuit. Significantly, AT NO TIME WAS THE PRESENT LAWSUIT BASED UPON ANY NEWS MEDIA REPORTS. IN FACT, I WAS NOT EVEN AWARE OF THE NEWS ARTICLE REFERENCED BY THE DEFENDANTS UNTIL THEIR MOTION TO DISMISS WAS FILED.

6) Pretext calls were made to the City Department of Planning and sure enough "yes" the City does indeed apply for and receive CDBG Funds on a yearly basis. And "no," copies were not available from the Planning Department, the originator of the City CHAS, Consolidated Plan and CDGB application packages. Being advised that

4

CDBG applications packages were available thru the "City Clerk" we subsequently learned that the "City Clerk" did not indeed have copies, but copies were available at the City Public Library. The City Public Library likewise did not have CDBG data and further was unfamiliar with the term and meaning of such.

7) Request for CDBG data was issued to the City Solicitor who summarily denied the data production citing confidentiality. (See correspondence from the City Solicitor) My thoughts turned once again to the following: During my tenure 1970-2003 of dealing with the U.S. Department of Housing and Urban Development ("HUD") during which I applied for, received and expended over 50 million dollars (excluding any CDBG funds received by the City of Central Falls) one certainty remains – any/all process under which federal funds are sought by states, municipalities, communities, business entities for profit and non-profit alike, or individuals: the process whether it be found in CDBG Handbooks, 24 CFR, A 133 & A128, (Audit Guides) 4350.3REV, IG 2004. REV or other authority must contain the following steps:

- Application (compliance with general and specific National Objectives)
- Receipt and review by HUD
- Acceptance/ rejection of application or request for additional date etc.
- Public review and accessibility of data submitted, comments by the public, forwarding of public comment to HUD.
- Receipt of funds by the requesting entity.
- Expending of subject funds exactly pursuant to application

- Inspection by Public Audit and/or other official to determine if received funds were expended consistent with application.

- In the Case of Entitlement Communities 24 CFR, such as Woonsocket – the application for CDBG funding is made directly to HUD – Boston. In the case of Non Entitlement Communities such as Central Falls the applications is made to the State of Rhode Island. Department of Administration, Office of Municipal Affairs "OMA"

- Certification / other overt statement(s) by recipient that funds received were spent in a manner consistent with application.

For the many years of receiving mortgage and rental assistance from HUD I have had to provide up to 11 separate "annual full audits" to the Federal Government. These audits were subject to financial and compliance statutes changing, oftentimes from year to year. Over 30 years of experience with Federal Audits gained me  knowledge beyond a layperson.


8) A. Following our inability to obtain copies of CDBG applications, CHAS, Consolidated Plans and associated other data and after consultation with attorneys, Freedom of Information Act ("FOIA") requests were issued to HUD Boston for CDBG packages submitted by the City.

B. Somehow, for some reason, unknown at that time and unknown at this writing the City refused to make submitted CDBG data available to the public.  City Department of Planning, City Clerk, Public Library and City Solicitor departments of the City summarily denied providing the data requested.  Is this to be construed as public

6

access? How could this be? Freedom of Information Act request ("FOIA") were

issued to U.S. Department of HUD who advised Attorney Lee Blais via telephone

that all CDBG data was indeed public information and most assuredly should have

been at all times available to the public.

C. Pursuant to report from Leon Blais, my attorney, HUD Boston personnel reported

to him via telephone that CDBG data is of course, public information and as such

should be available "at all times reasonable" to the public. (At this point I wondered

why HUD personnel did not pursue this obviously deficient CDBG application due to

the failure of the City to provide copies to the public.)

D. HUD-Boston honored our request and to my best recollection, several weeks later

at minimum, we received the requested data.

E. Review of City - submitted CDBG data included the following:

- National Objective Statements and assurances and representations that

  affirmative affordable housing policies were present, past and future.

  Without a general affirmative affordable housing policy, the National

  Objective is not met and funds may not be granted. (I reviewed 42 USCA

  @ 5301 and other compliance data within A133 and other sources)

- Specific, overt statements detailing the exact specific use of monies

  received. (Funds sought were non-housing items.)

- Confirmations and certifications that in fact funds received from the prior

  year were expended exactly as outlined in the previous years application.

- At this writing February 1, 2007 I have the benefit of having heard oral

  argument before Judge Wolf in Room 10 by Defendants' attorneys who

stated most clearly that the City had done nothing wrong in the
expenditure of funds received from CDBG grants.  An increase in
affordable housing was to be implemented thru "home ownership" --
according to Defendants' Attorneys.  This was a clear attempt to confuse
the court into thinking that expended CDBG funds did not have to mirror
the specific promises found within the application.  Further the word
"aspirations" was used to describe the language found within CDBG
applications – yet the actual submitted application wording to HUD does
not employ the word aspiration or "wish list." This is a real stretch.

9)  A. CDBG application data was ultimately received by my attorneys from HUD and
reviewed, and we noted all applications and submissions contained specific
statements of actions to be taken in support and encouragement of affordable
housing..

B. All yearly submissions included absolute certification ("CAPERS") that prior
year's promises and certifications had been accomplished without equivocation or
deviation upon the very items on which the City had cited within the prior
application.

C.  I asked Attorney Lee Blais to research a "Baltimore" case wherein false
application and expenditures had been the issue. (Circa 1989) the summary of that
case had been sent to program participants of HUD Programs.  After review of the
City CDBG applications one item stood out above others, the City stated that they
were to be affirmative in the protection of large bedroom family units undergoing
"MARK TO MARKET" – the lowering of rents by HUD of so called "Section 8" rent

levels to area market rents. Owners who enjoyed HUD rental assistance would choose to remain under the HUD umbrella at significantly reduced rents or "opt out" – discontinue with HUD assistance of any form. Note that the only apartment units in the City, however, subject to "MARK to MARKET" evaluations were owned by Gordon F. B. Ondis and I absolutely knew the City made "zero effort" in aiding my units during the "MARK TO MARKET" process. Yet the City certified additionally that they had done all the other wondrous things cited within their previous CDBG application including the increase of large bedroom family units and affirmative energies to protect "MARK TO MARKET" processes. (Note that I did not care to have the City's intervention having decided to disassociate from HUD) but the issue here is that the city certified that in fact it had aided in this endeavor)

CONCLUSION

1.The City refused production of CDBG application and obviously secluded such from the public pursuant to HUD regulation, Public access, review and comment is an integral part of the application process without which the process is deemed to be tainted and invalid.

2. The City represented in its CDBG application that in fact it was pursuing a general affirmative policy of affordable housing to meet National Objectives found in 24CFR and CDBG Guidelines and Handbooks, and other thresholds.

3. The city applied for grant money for specific items, under the threshold promise support and encouragement of specific affordable housing goals.. Those promises were not kept.

4. The City confirmed that it had expended prior years funds in a manner exactly consistent with the application.

5. Following the issuance of subject complaint, several other agencies interested in affordable housing contacted us and related similar stories of harassment, intimidation, denigration of challenged and minority peoples within the City. The Mayor consistently, without fail uses vulgarity and flushed disrespect of minorities. It was confirmed and concluded, again and again, this Mayor and administration is bigoted and certainly racist at its core, a mini evil empire. While this may be OK for a layperson, this community cannot maintain CDBG funds because the funds received by the City were stated to improve the quality of life of those in need, not to be used by the Mayor and City against this very element. This City may not use CDBG funds to suppress affordable – housing while certifying an opposite path, one of spirited affirmative action. It may be an American privilege or constitutional guarantee to be anti affordable housing or to harass, intimidate and denigrate minorities – but such acts and deeds are not permissible by the City if it receives CDBG funs.

6. The City did not of course include within its CDBG application to HUD copies of newspaper articles depicting the true, admitted policy of the City as it had done and referenced during oral arguments. Had it done so, the inconsistencies between policies and statements within the CDBG application, expenditure and certification would offer obvious inconsistencies and funds could not be issued. Representatives of HUD stated to Leon Blais and me during a meeting held in Boston that this would have created a "red flag."

HUD did not, simply put, have any idea of the true policy of the City. Once again however, the City <u>certified</u> the spending was consistent with specifics of application.

7. The cost to retrieve CDBG applications from HUD and to attempt to determine whether the City acted in a manner consistent with funds requested cost many thousands of dollars, the hiring of several attorneys, three investigators, personal research, and contacts with knowledgeable persons.

And, in the course of this inquiry I discovered that HUD did not know of the City's true policy.

And the public did not know of the CDBG and its flavor.

And the City in its applications and certifications to HUD represented falsely that it was going to and did, in fact, promote affordable housing.

8. Above statements are my own words interior – not edited or cleansed by my attorney and offer a stream of consciousness as to the development of this complaint. The dates given are to the best of my recollection and there may be some overlap of events. Insofar as my attorneys have explained or rather attempted to explain jurisdictional / original source concepts, I responded by asking the question – could other "members" of the public at large have succeeded, albeit difficult in retrieving the City's various CDBG applications and other information contained in my lawsuit. The answer is probably "no" but would the data retrieved have had any particular meaning or significance or impact even if there was success in retrieving all of the information contained in the present complaint? Undoubtedly not. After all even Defendants attorneys do not understand the restrictions imposed within the National Objective (42USCA 5301) as an example.

11

BY YOUR AFFIANT,
UNDER THE PAINS AND PENALTIES OF PERJURY

Gordon F.B. Ondis

Date: 2-7-07

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>*ex rel*. **GORDON F.B. ONDIS** )<br> )<br> **Plaintiff,** )<br> )<br> **vs.** )<br> )<br> **CITY OF WOONSOCKET, RHODE** )<br> **ISLAND; SUSAN D. MENARD, in** )<br> **her individual capacity and in her** )<br> **capacity as Mayor of the City of** )<br> **Woonsocket, Rhode Island; JOEL D.** )<br> **MATHEWS, in his individual** )<br> **capacity and in his capacity as Director** )<br> **of Planning and Community Devel-** )<br> **opment of the City of Woonsocket, Rhode** )<br> **Island; PAULETTE MILLER, in her** )<br> **individual capacity and in her capacity** )<br> **as Assistant Director of Planning and** )<br> **Community Development of the City of** )<br> **Woonsocket, Rhode Island; OWEN T.** )<br> **BEBEAU, in his individual capacity** )<br> **and in his capacity as Director of** )<br> **Human Services of the City of** )<br> **Woonsocket, Rhode Island; and** )<br> **MICHAEL ANNARUMMO, in his** )<br> **individual capacity and in his capacity** )<br> **as Director of Administration and Director** )<br> **of Public Works of the City of Woonsocket,** )<br> **Rhode Island;** )<br> )<br> **Defendants.** ) | **CIVIL NO. 05-10312-MLW** |

## <u>AFFIDAVIT OF LEE MATTHEWS IN SUPPORT OF RELATOR'S OBJECTION TO MOTION TO DISMISS</u>

Now comes Lee M. Matthews who swears and disposes as follows under the

pains and penalties of perjury:

1.      I have read the affidavit of Gordon F. B. Ondis regarding this case and I have

further read the associated complaint.

2.      I am further willing and able to testify that the verbal descriptions of meetings,

conversations and other data in which he mentions my name concerning CDBG

funding are accurate and true.

3.      Upon taking office as Mayor, City of Central Falls, State of Rhode Island in

1996 I was less than 100% knowledgeable on the many federal housing

programs, applicable regulations and CDBG funding. Gordon F. B. Ondis aided

me to a significant degree with reviewing previous CDBG applications, finding

awards and implementations. In addition, he aided me in preparing and

reviewing applications for CDBG funding during my tenure as Mayor.

4.      Gordon F. B. Ondis further recommended the hiring of Fraud and Compliance

Examiner Leon Blais whose  report was instrumental in uncovering waste and abuse of

CDBG grants with respect to certain subrecipients.

5.      States and Municipalities may request CDBG funding from the Federal

Government. However, they must maintain policies that are consistent with the

"National Objective" when receiving said funding. States and Municipalities

that adopt policies that have the opposite effect of promoting affordable housing

are in violation of the "National Objective" and therefore cannot receive Federal

funding. I learned this from my years of contact with both the State of Rhode

Island ("OMA") and HUD personnel, and knowledge of the "National

Objective" 42 USC 5301.

6.      This case USA vs. Woonsocket does have one similarity to litigation in which I was involved. CDBG funds received for specific line items or purposes must be used for those very items. I learned of this restriction from the Director of the OMA under oath in RI Superior Court.

7.      It is generally held that Gordon F. B. Ondis is extremely knowledgeable of housing programs and knows where to look for the proper "answers". To my further knowledge he has written and proposed through local legislators a new tax incentive plan to invigorate inner city housing here in Rhode Island.

8.      I am ready and willing to testify that Gordon F. B. Ondis has a very special knowledge of Audits, Government Housing Programs and associated litigations based upon my consulting with him during my tenure as Mayor.

9.      Properties owned by Gordon F. B. Ondis have historically been the best maintained rental properties in the City of Central Falls.

BY YOUR AFFIANT UNDER THE PAINS AND PENALTIES OF PERJURY.


Lee M. Matthews                    Date:  February 7, 2007

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel*. GORDON F.B. ONDIS<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF WOONSOCKET, RHODE<br>ISLAND; SUSAN D. MENARD, in<br>her individual capacity and in her<br>capacity as Mayor of the City of<br>Woonsocket, Rhode Island; JOEL D.<br>MATHEWS, in his individual<br>capacity and in his capacity as Director<br>of Planning and Community Devel-<br>opment of the City of Woonsocket, Rhode<br>Island; PAULETTE MILLER, in her<br>individual capacity and in her capacity<br>as Assistant Director of Planning and<br>Community Development of the City of<br>Woonsocket, Rhode Island; OWEN T.<br>BEBEAU, in his individual capacity<br>and in his capacity as Director of<br>Human Services of the City of<br>Woonsocket, Rhode Island; and<br>MICHAEL ANNARUMMO, in his<br>individual capacity and in his capacity<br>as Director of Administration and Director<br>of Public Works of the City of Woonsocket,<br>Rhode Island;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      CIVIL NO. 05-10312-MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF LEON BLAIS, ESQ. IN SUPPORT OF RELATOR'S OBJECTION TO MOTION TO DISMISS

Now comes Leon A. Blais, Esq. who swears and disposes as follows under the pains and penalties of perjury:

1

1.      I am Relator's counsel the above referenced matter.

2.      I am a member in good standing of the bar of this court.

3.      My firm was engaged by Relator to further investigate Relator's contention that Defendants in this action had made false statements to the U.S. Department of Housing and Urban Development regarding the affordable housing policies of the City of Woonsocket, Rhode Island in order to secure funding from the government.

4.      Such inquiry included interviews of witnesses, review of municipal records and review of federal records.

5.      The inquiry took nearly a year because records were not easily assessable.  For example, the City would not provide the CDBG application documents and zoning recordings had never been transcribed and could only be reviewed by listening to many hours of hearings.

6.      Ultimately, several thousands of pages of documents were amassed and provided to the U.S. Attorney's office.

7.      Relator conferred regularly regarding the inquiry, provided direction and suggested various lines of inquiry.

8.      At no time did Mr. Ondis base any portion of this lawsuit upon newspaper articles.

9.      I have reviewed the newspaper articles provided to the Court by Defendants to support their contention that the present action is based on public disclosures.

10.     The articles in question represent a very small fraction of the voluminous material and individual false statements referenced in the complaint filed in this action and which

are the subject of the several thousand pages of records and other documents provided to

the U.S. Attorney in support of this action.

BY YOUR AFFIANT UNDER THE PAINS AND PENALTIES OF PERJURY,


/s/   Leon A. Blais, Esq.


Respectfully Submitted,

**Government of the United States**
*ex rel.* **Gordon F.B. Ondis**

BY HIS ATTORNEY

/s/ Leon A. Blais
_____
Leon A. Blais  (BBO#652595)

BLAIS & PARENT
20 Cabot Blvd
Suite 300
Mansfield, MA 02048
508 618-1280
866 329-6175 fax
LBlais@BlaisParent.com